Case 1:25-cv-02131-OEM-LKE    Document 5-1    Filed 04/17/25    Page 1 of 64 PageID #: 72

# Exhibit 1

FILED: KINGS COUNTY CLERK 04/17/2025 05:11 PM INDEX NO. 506732/2025
NYSCEF DOC. NO. 10 RECEIVED NYSCEF: 04/17/2025
Case 1:25-cv-02131-EK-LKE Document 1 Filed 04/16/25 Page 1 of 62 PageID #: 73

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x
                                                                :
MEET BIMAL DOSHI and BRITTANY PARISI                            :
DOSHI,                                                          :     Case No. 25-cv-2131
                                                                :
                                    Plaintiffs,                 :     Removed from the Supreme Court of
                                                                :     the State of New York, in and for
            – against –                                         :     the County of Kings
                                                                :
CATHERINE KIM LEE,                                              :     Index No. 506732/2025
                                                                :
                                    Defendant.                  :
                                                                :
--------------------------------------------------------------- x

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE THAT, for the reasons stated below, defendant Catherine Kim Lee ("Ms. Lee") hereby removes this action (the "Action") from the Supreme Court of the State of New York, County of Kings (the "State Court") to the United States District Court for the Eastern District of New York.

Removal is proper under 28 U.S.C. § 1332. Ms. Lee appears for the purpose of removal only and for no other purpose and reserves all rights and defenses. As grounds for removal, Ms. Lee states as follows:

1.      The Complaint and Summons filed in this Action (the "Complaint") by Meet Bimal Doshi and Brittany Parisi Doshi (the "Doshis" or "Plaintiffs") seeks a judgment awarding Plaintiffs the amount of $172,500, plus interests, costs, fees, and reasonable attorneys' fees. Moreover, this Action is between citizens of different States, and therefore is within the original jurisdiction of this Court. 28 U.S.C. § 1332. Ms. Lee is a citizen of the State of California. The Doshis are citizens of the State of New York.

Case 1:25-cv-02162-LKE Document 1 Filed 04/16/25 Page 2 of 60 PageID #: 74

2.      On February 26, 2025, the Doshis filed a Summons and Complaint in the State Court under index number 506732/2025.  Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders served upon Ms. Lee or otherwise filed in State Court are attached to this Notice of Removal as Exhibit A.

3.      The Complaint alleges that Ms. Lee breached the parties' contract of sale regarding an apartment located at 99 State Street, Unit 4E, Brooklyn, NY 11201 (the "Contract") by acting in bad faith in violation of, among others, Sections 6.1-6.2.1, 6.4, and 13.1 of the Contract.  (Ex. A at 19-21 (Compl. ¶¶ 72-82).)  The Complaint further alleges that, as a result of Ms. Lee's alleged breach, Plaintiffs are entitled to retain Ms. Lee's $172,500 deposit (the "Deposit") as liquidated damages, and to all costs, including, without limitation, reasonable attorneys' fees and disbursements for services rendered in connection with this litigation.  (Ex. A at 20-21 (Compl. ¶¶ 80-82).)  Plaintiffs also seek a declaratory judgment that Ms. Lee breach the Contract by acting in bad faith, thereby entitling Plaintiffs to retain the Deposit.  (Ex. A at 21-24 (Compl. ¶¶ 83-96).)

4.      Ms. Lee disputes that she acted in bad faith and maintains that, under Section 6.3 of the Contract, she is entitled to the return of her Deposit.  (Ex. A at 29 (Contract).)

5.      On March 17, 2025, the parties filed a stipulation in which Ms. Lee agreed to accept service of the Complaint through her attorneys.  The parties further agreed that Ms. Lee shall answer, move against, or otherwise respond to the Complaint on or before April 28, 2025.  (Ex. A at 55-56 (Stipulation).)  No motions or other proceedings in this Action are pending in the State Court.  Ms. Lee's time to respond to the Complaint has not expired.

Case 1:25-cv-02137-EM-LKE Document 1 Filed 04/16/25 Page 3 of 64 PageID #: 75

6.      Removal of this Action is timely pursuant to 28 U.S.C. § 1446(b) because it is being effected within 30 days of Ms. Lee being served with the Complaint.

7.      Venue is proper in this Court because this Court is "the district court of the United States for the district and division within which [this] action is pending." 28 U.S.C. § 1446(a).

8.      Moreover, Section 22 of the Contract provides that "[a]ny action or proceeding arising out of this Contract shall be brought in the county or Federal district where the Unit is located and the Parties hereby consent to said venue." (Ex. A at 32 (Contract).)

<u>Federal Subject Matter Jurisdiction</u>

9.      Removal of this Action is proper because the matter in controversy is $172,500, exclusive of interest and costs, exceeding the sum or value of $75,000, and is between citizens of different States, and therefore falls within this Court's subject matter jurisdiction under 28 U.S.C. § 1332(a)(1).

10.     Section 1332 provides that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between . . . citizens of different States[.]" 28 U.S.C. § 1332(a)(1). And, as relevant here, 28 U.S.C. § 1441 provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . ., to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

11.     Defendant Ms. Lee resides and is domiciled in California.

Case Case v. 25-1362-LKE Document Filed 04/17/25 Page 4 of 60 PageID #: 76

12.     Plaintiffs the Doshis reside and are domiciled in New York.

<u>Other Procedural Requirements</u>

13.     Pursuant to 28 U.S.C. § 1446(d), Ms. Lee will promptly file a Notice of
Filing of Notice of Removal (the "Notice of Filing") with the Clerk of the State Court and
will serve Plaintiffs with a copy of the Notice of Filing and this Notice of Removal.  Ms. Lee
will file with this Court a Certificate of Service of the Notice of Filing and this Notice of
Removal.

14.     This Notice of Removal is signed pursuant to Rule 11 of the Federal Rules
of Civil Procedure.

15.     By filing this Notice of Removal, Ms. Lee does not waive and expressly
reserves any defenses that may be available to her and does not concede that the allegations
in the Complaint state a valid claim under any applicable law.

16.     Ms. Lee reserves the right to supplement or amend the foregoing Notice of
Removal to add other bases for federal jurisdiction that become apparent as a result of any
amended complaint filed by Plaintiff in this Action or otherwise.

Case Case 1:25-cv-02137-LDH-LKE Document 1 Filed 04/16/25 Page 5 of 64 PageID #: 77

WHEREFORE, Ms. Lee hereby removes this Action from the Supreme Court of

the State of New York, County of Kings, to this Court.


**COHEN & GRESSER LLP**


*/s/ Allon Lifshitz*
Allon Lifshitz
alifshitz@cohengresser.com
Randall W. Bryer
rbryer@cohengresser.com
800 Third Avenue, 21st Floor
New York, NY  10022
Phone:  (212) 957-7600
Fax:  (212) 957-4514

*Attorneys for Defendant Catherine Kim Lee*

**JS 44 (Rev. 06/17)**

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Meet Bimal Doshi and Brittany Parisi Doshi

### DEFENDANTS
Catherine Kim Lee

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Los Angeles, CA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Kishner Miller Himes, P.C. - 40 Fulton St., 12th Fl., New York, NY 10038 - (212) 585-3425

Attorneys *(If Known)*
Cohen & Gresser LLP - 800 Third Ave., 21st Fl., New York, NY 10022 - (212) 957-7600

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | |
|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332. The amount in controversy is $172,500, exceeding the sum or value of $75,000. The case is between citizens of different States
Brief description of cause:
The complaint alleges a breach of the parties' contract of sale regarding an apartment located in Brooklyn, NY.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
$172,500

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____  DOCKET NUMBER _____

DATE
2025.04.16

SIGNATURE OF ATTORNEY OF RECORD
*Allon Lifshitz*

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

## CERTIFICATION OF ARBITRATION ELIGIBILITY

Local Arbitration Rule 83.7 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000, exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed.

Case is Eligible for Arbitration ☐

I, ___Allon Lifshitz___, counsel for ___Catherine Kim Lee___, do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

☒ monetary damages sought are in excess of $150,000.00 exclusive of interest and costs,

☐ the complaint seeks injunctive relief, or

☐ the matter is otherwise ineligible for the following reason:

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks. Add an additional page if needed.

## RELATED CASE STATEMENT (Section VIII on the Front of this Form)

Please list all cases that are arguably related pursuant to Division of Business Rule 3 in Section VIII on the front of this form. Rule 3(a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 3(a) provides that "A civil case shall not be deemed "related" to another civil case merely because the civil case involves identical legal issues, or the same parties." Rule 3 further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (b), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

## NEW YORK EASTERN DISTRICT DIVISION OF BUSINESS RULE 1(d)(3)

*If you answer "Yes" to any of the questions below, this case will be designated as a Central Islip case and you must select Office Code 2.*

1. Is the action being removed from a state court that is located in Nassau or Suffolk County? ☐Yes ☒No

2. Is the action—not involving real property—being brought against United States, its officers or its employees AND the majority of the plaintiffs reside in Nassau or Suffolk County? ☐Yes ☒No

3. If you answered "No" to all parts of Questions 1 and 2:

   a. Did a substantial part of the events or omissions giving rise to claim or claims occur in Nassau or Suffolk County? ☐Yes ☒No

   b. Do the majority of defendants reside in Nassau or Suffolk County? ☐Yes ☒No

   c. Is a substantial amount of any property at issue located in Nassau or Suffolk County? ☐Yes ☒No

4. If this is a Fair Debt Collection Practice Act case, was the offending communication received in either Nassau or Suffolk County? ☐Yes ☐No

*(Note, a natural person is considered to reside in the county in which that person is domiciled; an entity is considered a resident of the county that is either its principal place of business or headquarters, of if there is no such county in the Eastern District, the county within the District with which it has the most significant contacts).*

## BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.

☒ Yes ☐ No

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?

☐ Yes (If yes, please explain) ☒ No

I certify the accuracy of all information provided above.

**Signature:** *Allon Lifshitz* 2025.04.17

Revised 02.13.2025; Effective 02.17.2025

# Exhibit A

Case 2:25-cv-02213-EM-LGD   Document 5-1   Filed 04/16/25   Page 2 of 56 PageID #: 81

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

-----------------------------------------------------------------x

MEET BIMAL DOSHI and BRITTANY PARISI
DOSHI,

                               Plaintiffs,

         - against -

CATHERINE KIM LEE,

                               Defendant.

-----------------------------------------------------------------x

Index No.: _____/2025

**<u>SUMMONS</u>**

**TO THE ABOVE-NAMED DEFENDANT:**

       **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve

a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance on the attorneys for the plaintiffs within 20 days after the service of this summons,

exclusive of the day of service (or within 30 days after service is complete if this summons is not

personally delivered to you within the State of New York). In case of your failure to appear or

answer, judgment will be taken against you by default for the relief demanded in the complaint.

       Plaintiffs designate Kings County as the place of trial. The basis of venue is that the real

property that is the subject of the dispute is located in Kings County, New York.

Dated: New York, New York
       February 26, 2025

                                  **KISHNER MILLER HIMES, P.C.**
                                  *Attorneys for Plaintiff*

               By:     <u>/s/ Ryan O. Miller</u>
                       Ryan O. Miller
                       Eric B. LaMons
                       40 Fulton Street, 12th Floor
                       New York, New York 10038
                       (212) 585-3425
                       <u>rmiller@kishnerlegal.com</u>

Case 1:25-cv-02165-EM-DC Document 1 Filed 04/16/25 Page 3 of 50 PageID #: 82

TO:  **CATHERINE KIM LEE**
     685 Bellefontaine Street
     Pasadena, California 91105

2

Case 1:25-cv-02162-EK-LKE   Document 1   Filed 04/16/25   Page 4 of 16   PageID #: 83

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

-----------------------------------------------------------------x

MEET BIMAL DOSHI and BRITTANY PARISI
DOSHI,                                              Index No.: _____/2025

                              Plaintiffs,

                                                    **COMPLAINT**

            - against -

CATHERINE KIM LEE,

                              Defendant.

-----------------------------------------------------------------x

  Plaintiffs Meet Bimal Doshi and Brittany Parisi Doshi ("Plaintiffs" or "Sellers"), by and

through their attorneys, Kishner Miller Himes P.C., by way of a Complaint against Defendant

Catherine Kim Lee ("Defendant" or "Purchaser"), allege and state as follows:

<u>**NATURE OF THE ACTION**</u>

  1.  This is an action demonstrating precisely the opposite of how buyers should

conduct themselves before, during, and after an interview with a cooperative apartment board as

part of prospective purchase. Plaintiffs now seek the recovery of a contract deposit paid by

Defendant for her prospective purchase of Plaintiffs' cooperative apartment to which Plaintiffs are

entitled as liquidated damages as a result of Defendant's breach of the contract of sale by her

failing to act in good faith and instead deliberately acting to ensure that Defendant's application

was denied by the board of the cooperative to prevent the consummation of the sale.

  2.  The Plaintiffs are one of ten shareholders in the 99 State Associates, Inc.

("Corporation"). The Corporation allows each of the non-interested shareholders the opportunity

to participate in an interview for a new prospective purchaser/shareholder and are given a right to

vote for or against that prospective purchaser/shareholder's application into the Corporation.

Case 1:25-cv-02162-EM-DuN Document Filed 04/16/25 4/17/25 5 Page Pag 161 PageID #: 84

3.      On or about October 18, 2024, Plaintiffs and Defendant entered into a contract of sale ("Contract of Sale") for the purchase by Defendant of Coop Unit 4E (the "Unit") of the cooperative located at 99 State Street, Brooklyn, New York 11201 (the "Building") for the purchase price of $1,725,000.00.

4.      In accordance with the Contract of Sale, Defendant submitted a contract deposit in the amount of $172,500.00 comprising ten percent (10%) of the purchase price ("Deposit").

5.      After executing the Contract of Sale, Defendant, on or about November 15, 2024, submitted a board application ("Application") to all of the shareholders for the Corporation.

6.      As a required component of the Corporation's review of the prospective purchaser, the nine (9) non-interested shareholders of the Corporation scheduled and held an interview with Defendant on December 3, 2024.

7.      After Defendant stated in the December 3, 2024 interview with the nine (9) non-interested shareholders of the Corporation that Defendant's eldest daughter, Jalen Lee ("Jalen"), would be living with Defendant in the Unit, and might, in fact, be the primary resident of the Unit rather than Defendant, leading to concerns that Defendant might treat the Unit as a pied-à-terre (something the Defendant knew the Corporation would not allow), the nine (9) non-interested shareholders of the Corporation scheduled and held a second interview with Defendant and Jalen on January 7, 2025.

8.      Although the purpose of the January 7, 2025 interview was for the nine (9) non-interested shareholders of the Corporation to meet Jalen, as they did, Defendant went out of her way to pose, unprompted and unsolicited, a series of issues that immediately posed direct threats to the Corporation's approval of Defendant as a prospective purchaser – most of which issues had never before been disclosed to Plaintiffs or the Corporation.

2

Case 1:25-cv-02162-EM-DG   Document Filed 04/16/25   Page 6 of 50   PageID #: 85

9.      In fact, immediately after the interview before the nine (9) non-interested

shareholders of the Corporation, one of the shareholders wrote to the other eight (8) non-interested

shareholders of the Corporation the following:

> OY - that was painful.
> Obviously everyone will make up their own minds and vote accordingly. But
> here's my two cents.
>
> First, I was totally expecting this to be an easy yes. Jalen was great. But any one
> of the following issues would be enough of a disqualifier.
>
> 1. A large, anxious dog who by applicant's own admission "barks a lot"
>
> 2. Buyer likely to be absent a lot
>
> 3. Buyer asks at this late stage, to change the terms of purchase so that Jalen is
> a co-owner
>
> 4. Buyer has bad knees and asked about installing a chair lift. This would be a
> major expense, would take up a lot of space and be of no interest or use to the
> majority of shareholders.
>
> 5. They asked about how thin the walls are and said they like to play loud music
>
> Cathy repeated that her father's illness was 'un-forseen' - but he's 90. Even a
> self-reliant, fit 90yr old is highly likely to have forseeable health issues. She
> states repeatedly that she is the primary care-giver without mentioning any plan
> for her role to be covered when she leaves.
>
> I wish this had gone better…

10.     The next day, another shareholder in the Corporation wrote to the other eight (8)

non-interested shareholders of the Corporation, expressing, among other things, that "… I think

this summarizes many of the factors that are on all our minds after yesterday's meeting…"

11.     Of course, not only did Defendant take these purposeful and intentional steps to

"spoil" her interview with the nine (9) non-interested shareholders of the Corporation, none of this

was indicated, mentioned, or addressed in any way in the Contract of Sale executed by Plaintiffs

and Defendant.

3

Case 1:25-cv-02162-EM-DNE   Document Filed 04/16/25 7 Page 7 of 64 PageID
#: 86

12.     In light of all of these substantial problems that Defendant voluntarily chose to inject into the Corporation's review process, the nine (9) non-interested shareholders of the Corporation, unsurprisingly, did not approve Defendant as a prospective purchaser, notifying Defendant of the denial on January 17, 2025.

13.     The next day, one of the nine (9) non-interested shareholders of the Corporation wrote a note to Plaintiffs indicating:

> I just wanted to say how much we all care about and love you two and your family, and how wrenching it was to make a decision that would make life difficult for you.
> Also to say that in the 25 (!) years we've lived here, no one has ever been turned down by the CoOp. In fact, it was extremely rare for even one 'no' vote out of all 9 units.
> This time, as far as I know, there was only one vote in [Defendant's] favor.

14.     Defendant deliberately sought by her conduct in the interview process to obtain the Corporation's denial, so that Defendant would not have to close on the sale of the Unit.

15.     On January 24, 2025, Plaintiff's real estate counsel wrote to Defendant's counsel, explicitly stating that Defendant's actions in bad faith in the interview process were and are in direct breach of the Contract of Sale, having violated Defendant's obligations under the Contract of Sale to act in good faith and making numerous representations in the interview process contrary to or omitted from the representations made in the Contract of Sale, as executed by the parties.

16.     In contrast, Plaintiffs complied with all of their obligations under the Contract of Sale.

17.     As a result of Defendant's bad faith conduct deliberately causing the Corporation's rejection of Defendant's Application and preventing the consummation of the Contract of Sale, Plaintiffs are entitled under the terms of the Contract of Sale to retain the Deposit as liquidated damages.

4

Case 1:25-cv-02161-LTS-DJC Document 1 Filed 04/16/25 Page 8 of 56 PageID #: 87

18.     Plaintiffs are also entitled under the terms of the Contract of Sale, due to Defendant's breach, to seek recovery of their costs and fees, including attorneys' fees, incurred in bringing and pursuing this action.

19.      Accordingly, Plaintiffs seek herein to recover the Deposit and their reasonable attorneys' fees to which they are entitled as a result of Defendant's breach of the Contract of Sale.

**THE PARTIES**

20.     Plaintiffs are individuals currently owning Unit 4E (the "Unit") located at 99 State Street, Brooklyn, New York 11201 and residing at 50 Kane Avenue, Larchmont, New York 10538.

21.     Defendant is an individual currently residing at 685 Bellefontaine Street, Pasadena, California 91105.

**JURISDICTION**

22.     This Court has personal jurisdiction over Defendant because Defendant sought to purchase real property in Kings County, which is the prospective transaction that is the subject of this action.

23.     Venue is proper in Kings County since it is the location of the Unit at issue.

**FACTUAL ALLEGATIONS**

24.     The Building at issue here is a ten-unit cooperative residential building located at 99 State Street, Brooklyn, New York 11201.

25.     As a cooperative residential building, the Building is a self-managed property, meaning the Unit owners themselves manage the property, oversee its maintenance, and evaluate any potential new Unit owners. This is conducted through the Board of Directors of 99 State Associates, Inc. ("the Corporation"), the ostensible management company of the Building, in which each of the Unit owners is a member.

5

Case 1:25-cv-02162-LDH-LKE   Document 1-1   Filed 04/16/25   Page 9 of 50 PageID #: 88

26.     At a minimum, any potential new Unit owner must submit to the Corporation a completed "Prospective Buyer Application" ("Application") with a copy of the contract of sale agreed upon with the seller and all required supporting documentation.

27.     In addition, any potential new Unit owner must be subject to an interview process before all of the non-interested shareholders of the Corporation.

28.     Following the review by the non-interested shareholders of the Corporation of the information, documentation, and interview(s) provided by the potential new Unit owner, such prospective purchaser must be approved by a majority vote of the non-interested shareholders of the Corporation. This means a majority vote of the nine existing Unit owners, excluding the one Unit owner who is the prospective seller, who is recused from the vote for that reason.

29.     Such approval by the Corporation is a necessary prerequisite to the closing of any sale of any Unit in the Building.

30.     In September 2024, Defendant began looking for an apartment in the New York City metropolitan area to purchase. Pursuant to that goal, she hired Sarah Sachs of Keller Williams as her real estate broker.

31.     Defendant visited a number of apartments including one, Unit 2W, located at the Building at issue here. Defendant submitted an offer for Unit 2W in the Building, but was outbid by another prospective purchaser.

32.     Subsequently, Ms. Sachs learned of, and informed Defendant of, the potential sale of Unit 4E in the Building, the Unit at issue herein. Defendant attended, virtually, a showing of the Unit on October 13, 2024. Defendant submitted an offer on the Unit later that day.

33.     The next day, October 14, 2024, Plaintiffs accepted Defendant's offer for the Unit.

Case 2:25-cv-02313-EK-LGD   Document 1   Filed 04/03/25   Page 9 of 24 PageID #: 89

34.     The parties then worked with their respective agents and attorneys to craft and reach

agreement on the Contract of Sale.

35.     The Contract of Sale was fully executed on October 18, 2024, with a closing date

of February 1, 2025. A copy of the Contract of Sale is attached hereto as Exhibit A.

36.     The Contract of Sale explicitly provided that the *only* occupant of the Unit would

be the Defendant Purchaser herself, and she would have no pets of any kind.

> 1.23 *All "Proposed Occupants" of the Unit are: Purchaser*
> 1.23.1 persons and relationship to Purchaser: [BLANK]
> 1.23.2 pets: [BLANK]

Ex. A, Contract of Sale Sec. 1.23 (emphasis added).

> 4.2. 1 Purchaser is acquiring the Shares and Lease for residential occupancy of
> the Unit *solely by the Proposed Occupants identified in ¶ 1.23.*

Ex. A, Contract of Sale Sec. 4.2.1 (emphasis added).

37.     The Contract is clear that the "Purchaser represents that the Unit will be her primary

residence." Ex. A, Contract of Sale, Seller's Rider, Sec. 35(e).

38.     The Contract specifically states that the representations in the Contract must be

complete and nothing different or new can be provided in Defendant's Application.

> 4.2.5 Purchaser *shall not* make any representations to the Corporation contrary
> to the foregoing and shall provide all documents in support thereof required by
> the Corporation in connection with Purchaser's application for approval of this
> transaction;
>
> 4.3 Each Party covenants that its representations and covenants contained in ¶
> 4 shall be true and complete at Closing and, except for ¶ 4.1.6, shall survive
> Closing but any action based thereon must be instituted within one year after
> Closing.

Ex. A, Contract of Sale, Secs. 4.2.5 & 4.3 (emphasis added).

39.     The Contract provides as well that any sale must be approved by the Corporation

and the prospective purchaser must act in "good faith" to seek the Corporation's approval.

Case 2:25-cv-03113-EK-LGD   Document 1   Filed 04/16/25   Page 11 of 56 PageID #: 90

6.1 This sale is subject to the unconditional consent of the Corporation.

6.2 Purchaser shall in good faith:

6.2.1 submit to the Corporation or the Managing Agent an application with respect to this sale on the form required by the Corporation, containing such data and together with such documents as the Corporation requires, and pay the applicable fees and charges that the Corporation imposes upon Purchaser. All of the foregoing shall be submitted within 10 business days after the Delivery Date, or, if ¶ 1.20.1 or 1.20.2 applies and the Loan Commitment Letter is required by the Corporation, within 3 business days after the earlier of (i) the Loan Commitment Date (defined in ¶ 1.21) or (ii) the date of receipt of the Loan Commitment Letter (defined in ¶ 18.1.2);

6.2.2 attend (and cause any Proposed Occupant to attend) one or more personal interviews, as requested by the Corporation;

Ex. A, Contract of Sale, Secs. 6.1-6.2.2.

40.     Indeed, the Contract of Sale *explicitly states that the prospective Purchaser's bad faith is a basis for default* under the contract.

> 6.4 *If such consent is refused, or not given, due to Purchaser's bad faith conduct. Purchaser shall be in default and ¶ 13.1 shall govern.*

Ex. A, Contract of Sale, Sec. 6.4 (emphasis added).

41.     Section 13.1 of the Contract, in turn, provides that such a default by Defendant, as the prospective Purchaser, will entitle Plaintiffs, as the prospective Sellers, to retain the Deposit as liquidated damages.

> 13.1 In the event of a default or misrepresentation by Purchaser, Seller's sole and exclusive remedies shall be to cancel this Contract, *retain the Contract Deposit as liquidated damages* and, if applicable, Seller may enforce the indemnity in ¶ 13.3 as to brokerage commission or sue under ¶ 13.4. Purchaser prefers to limit Purchaser's exposure for actual damages to the amount of the Contract Deposit, which Purchaser agrees constitutes a fair and reasonable amount of compensation for Seller's damages under the circumstances and is not a penalty. The principles of real property law shall apply to this liquidated damages provision.

Ex. A, Contract of Sale, Sec. 13.1.

8

Case 2:25-cv-03131-EM-D-RML   Document 1   Filed 04/08/25   Page 12 of 67 PageID #: 91

42.     Further, the Contract provides that, to the extent Plaintiffs are forced to pursue litigation in order to enforce its rights under the Contract after a breach by Defendant, Plaintiff is entitled to recover, *inter alia*, its reasonable attorneys' fees incurred in doing so.

> 40. <u>Waiver of Trial by Jury</u>. Both Purchaser and Seller irrevocably waive the right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Contract. In connection with any litigation arising out of this Contract, the prevailing party shall be entitled to recover all costs thereof, including, without limitation, reasonable attorneys' fees and disbursements for services rendered in connection with such litigation.

Ex. A, Contract of Sale, Seller's Rider Sec. 40.

43.     On or about November 15, 2024, Defendant submitted her completed Application to the Corporation, which included, *inter alia*, a copy of the fully executed Contract of Sale.

44.     This Application submitted by Defendant contained a number of representations that were *not* included in, referenced in, or addressed in the Contract of Sale at all.

45.     These new representations in the Application included, *inter alia*, that (a) Jalen would be living in the Unit as well as Defendant and (b) Defendant would be bringing two pets to the Unit, a large "Goldendoodle" dog and a cat.

46.     The Corporation then scheduled an interview with Defendant which was held on December 3, 2024. This interview took place between Defendant and the nine (9) non-interested Unit owners of the Building and shareholders of the Corporation, excluding Plaintiffs, as the prospective seller.

47.     In the interview on December 3, 2024, Defendant stated that she planned for her eldest daughter, Jalen, to not only be living in the Unit with her, but that Jalen might be living there on her own as the primary resident instead of Defendant. None of this was indicated in the Contract of Sale, nor was the possibility of Jalen living in the Unit independently of Defendant even

indicated in the Application. Significantly, Defendant would not confirm in this interview that the Unit would be her primary residence.

48.    This statement by Defendant prompted the Corporation to schedule a second interview, with the stated purpose of allowing the nine (9) non-interested members of the Corporation to meet and interview Jalen as part of the Corporation's evaluation of the prospective sale.

49.    This second interview, between Defendant, Jalen, and the nine (9) non-interested members of the Corporation took place on January 7, 2025.

50.    In that January 7, 2025 interview, completely unprompted and unsolicited, Defendant deliberately and intentionally created multiple problems with her application for Corporation approval by making a series of demands and raising issues contrary to and omitted from the Contract of Sale.

51.    One of the Unit owners sitting on the Corporation and present in the January 7, 2025 interview with Defendant was Kate Teale, who emailed the other members of the Corporation, including Plaintiffs, immediately after the interview concluded to identify multiple obstacles placed by Defendant to prevent the Corporation's approval and eliminate any chance of consummation of the sale.

> OY - that was painful.
>
> Obviously everyone will make up their own minds and vote accordingly. But here's my two cents.
>
> First, I was totally expecting this to be an easy yes. Jalen was great. But any one of the following issues would be enough of a disqualifier.
>
> 1. A large, anxious dog who by applicant's own admission "barks a lot"
>
> 2. Buyer likely to be absent a lot

Case 2:25-cv-02131-EK-LGD Document 1 Filed 04/16/25 Page 14 of 67 PageID #: 93

3. Buyer asks at this late stage, to change the terms of purchase so that Jalen is a co-owner

4. Buyer has bad knees and asked about installing a chair lift. This would be a major expense, would take up a lot of space and be of no interest or use to the majority of shareholders.

5. They asked about how thin the walls are and said they like to play loud music

[Defendant] Cathy repeated that her father's illness was 'un-forseen' - but he's 90. Even a self[-]reliant, fit 90yr old is highly likely to have forseeable health issues. She states repeatedly that she is the primary care-giver without mentioning any plan for her role to be covered when she leaves.

I wish this had gone better…

*See* Email dated January 7, 2025 attached hereto as <u>Exhibit B</u>, at 2.

52.    In addition, Defendant would not even commit to a time frame as to when she might actually move in to the Unit. In the December 3rd interview, she had indicated she would move in at the end of the summer of 2025, but in the January 7th interview, she would not even confirm the move by that late date.

53.    Further, Jalen stated in the interview that after she graduated college, she might then look for employment in Los Angeles, not New York, meaning she might not be a long-term resident of the Unit either.

54.    The next day, on January 8, 2025, Leah Herman, another non-interested member of the Corporation and Unit owner, responded to Ms. Teale's email, stating that "I think this summarized many of the factors that are on all our minds after yesterday's meeting", anticipating, as a result, "an unprecedented buyer denial". Exhibit B, at 1.

55.    Plainly, Defendant, with her bad faith conduct in this interview, had deliberately made it nearly impossible for the Corporation to approve her as a prospective purchaser of the Unit, killing any chances of the sale before it could close in breach of the Contract of Sale.

11

Case 2:25-cv-03131-EMC Document 1 Filed 04/04/25 Page 62 of 200 Page ID #: 94

56.     On January 10, 2025, in apparent recognition that she had "blown" the interview and perhaps attempting to avoid the readily apparent assertion that she had done so in bad faith, after her real estate counsel had warned her that such bad faith would jeopardize her Deposit, Defendant wrote to some of the non-interested shareholders of the Corporation with whom she had interviewed. She said she wanted to "clarify a couple of things that may have been taken in the wrong context from our meeting". Namely, she said she "ask[ed] questions about sound traveling through walls" only so "we don't disturb anyone" when listening to music, and claimed that she believed "that once you get to know" her dog, who "may bark at times, "you will love her and she is not a nuisance or troubling with excessive barking". This email did not change any of the threats she had made in her interview, nor "paper over" her actions taken in bad faith therein.

57.     On January 12, 2025, Ms. Herman, on behalf of the Corporation, wrote to Defendant stating, among other things, that "your description of your dog in this week's follow up did raise a new issue. Noise, particularly a barking dog, is problematic", asking how Defendant "might address" this issue. Ms. Herman also made clear to Defendant that "our coop does not permit pied a terre[]", but that "the coop is expecting buyers to reside in their units" consistent with "NYC coop living (the consistent extra workload and expectations of a self-managed building)" and the fact that "we collectively as a coop own the building and all must share in the work it takes to manage and maintain it" in contrast to Defendant's stated plan to spend much of her time in California instead taking care of her parents there.

58.     Defendant meekly responded that she had "never had any issues with my dog, Nikki, or any noise complaints for her barking" and did not "anticipate this being a problem", though Defendant had not lived in an apartment before. Defendant also claimed that she "intend[s] to show up in whatever ways I can" for work in the Building though her "parents do need

12

caretaking at this point, and so I will be traveling back and forth as needed" and her daughter, though not identified in the Contract of Sale, would be living there and she would be "contributing to the community". In other words, Defendant was not taking back or changing any of the alarming things she said in the January 7th interview that were of grave concern to the non-interested shareholders of the Corporation.

59.     On January 17, 2025, Ms. Herman, speaking on behalf of the Corporation, notified Plaintiff's real estate counsel that "the coop voted 'no' on approving [Defendant's] proposed purchase of unit 4E from the [Plaintiffs]."

60.     Plaintiff's real estate counsel conveyed this information to Defendant's counsel the same day.

61.     The vote of the nine Unit owners was six 'no' votes, two abstentions, and only one 'yes' vote. The Plaintiff's, again, recused themselves and did not cast a vote.

62.     On January 18, 2025, Ms. Teale emailed Plaintiffs to tell Plaintiffs "how wrenching it was to make a decision that would make life difficult for you" by denying approval of the sale to Defendant under the circumstances deliberately posed by Defendant, noting the "in the 25 (!) years we've lived here, no one has ever been turned down by the CoOp. In fact, it was extremely rare for even one 'no' vote out of all 9 units. This time, as far as I know, there was only one vote in [Defendant's] favor."

63.     The myriad of deeply problematic issues that Defendant chose to throw at the Corporation in bad faith were so extreme and so unusual that a Corporation that had not said no to anyone in two and a half *decades* was forced to say no to her.

13

Case 2:25-cv-02131-EMK-DOC  Document  Filed 04/16/25  Page 17  Page 64  Page ID #: 96

64.     If Defendant had said nothing in the January 7th interview and simply allowed the non-interested shareholders of the Corporation to meet Jalen in that interview, Defendant likely would have been approved as a prospective purchaser.

65.     Indeed, Defendant had been informed prior to that interview, by Plaintiffs' real estate broker, as well as her own, that, if anything, she just needed to be clear that, consistent with the Contract of Sale and the Application, the Unit was going to be her primary residence, and not, contrary thereto, that Jalen might be the primary resident or the actual owner or co-owner. Defendant deliberately acted against such advice.

66.     However, after apparently changing her mind about moving forward with the sale post-execution of the Contract, Defendant intentionally sabotaged the process. Defendant wasn't just going to have a pet dog, which might be acceptable, but a "large, anxious" dog who "barks a lot". Defendant wasn't just going to have her daughter cohabitate the Unit, which could be fine, but suddenly wanted the daughter to be a co-*owner* of the Unit. Defendant was going to be "absent a lot" as the "primary caregiver" for her elderly parents in California, with no "plan for her role to be covered when she leaves." Not only that, but Defendant wanted an expensive "chair lift" installed and planned to "play loud music". *See* Exhibit B, Email dated January 7, 2025 recounting statements made by Defendant to the Corporation, at 2.

67.     Defendant told the Corporation, in no uncertain terms, that she specifically planned to be a disruptive, noncooperative, and frequently absent Unit owner, purposefully leaving the Corporation with no choice but to say 'no' for the first time in *twenty-five years*.

68.     On January 24, 2025, Plaintiffs' real estate counsel wrote to Defendant's counsel providing notice that Defendant "is in default" of the Contract of Sale and this "material default by the [Defendant] [is] grounds for [Plaintiffs] to cancel the Contract and retain the Contract

14

Case 2:25-cv-02131-EMO Document 1 Filed 04/16/25 Page 18 of 27 PageID #: 97

Deposit as liquidated damages under Paragraph 13.1 of the Contract." *See* Letter dated Jan. 24, 2025, attached hereto as <u>Exhibit C</u>, at 1. Defendant, as described above, "made misrepresentations" to the Corporation "contrary to what was represented in the Contract" and "did not act in good faith under Section 6.2 of the Contract", with Defendant acting in violation of and being in default of Sections "1.23; 1.23.2, 4.2.1; 4.2.5; 4.3; 6.2.1; 6.4; and Seller's Rider 35(e)". Exhibit C, at 1. As a result, Plaintiffs' real estate counsel informed Defendant's counsel that the Plaintiffs "shall retain the Contract Deposit, the Contract is deemed null and void, and reserve [their] rights under the Contract and applicable law". Exhibit C, at 2.

69.     Defendant has, to date, refused to agree to Plaintiffs' retention of the Deposit and has demanded Plaintiffs return the Deposit to her despite her bad faith in violation of the Contract of Sale.

70.     On February 12, 2025, Plaintiff's undersigned counsel served on Defendant's counsel a formal Notice of Objection, reiterating Defendant's multiple breaches of the Contract of Sale in her "bad faith conduct" and rejecting Defendant's demand for the Deposit. *See* Letter dated Feb. 12, 2025, attached hereto as <u>Exhibit D</u>. The undersigned made clear that Plaintiffs, as a result of Defendant's bad faith in breach of the contract, are entitled both to retain the Deposit as liquidated damages and to seek recovery of any attorneys' fees they incur in being forced to bring litigation to hold Defendant accountable.

71.     Defendant has refused to acknowledge her bad faith conduct in violation of the Contract of Sale, has refused to recognize Plaintiffs' right to the Deposit under the terms of that contract, and has left Plaintiffs with no choice but to bring this action to hold her responsible for her misdeeds.

Case 2:25-cv-02313-EK-MMH Document 1-4 Filed 04/26/25 Page 19 of 64 PageID #: 98

## AS AND FOR A FIRST CAUSE OF ACTION
## (BREACH OF THE CONTRACT OF SALE)

72.     Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs hereof as if set forth in full herein.

73.     The Contract of Sale is a valid and enforceable contract by and between Plaintiffs and Defendant.

74.     As set forth herein, Defendant breached the Contract of Sale by, *inter alia*, acting in bad faith to deliberately sabotage the chances of the Corporation approving the sale through making a series of claims in the interview process she knew would lead to Corporation to deny her Application as a prospective purchaser as well as making misrepresentations in the Contract of Sale she later sought to change or renege upon after the fact.

75.     These claims made by Defendant in the interview process intentionally seeking disapproval of her Application and thereby preventing the sale from ever closing include, but are not limited to:

   a. Defendant planned to have a "large, anxious dog" whom she deliberately said "barks a lot";
   b. Defendant planned "to be absent a lot", frequently in California to be the "primary caregiver" for her elderly parents, despite the need for any unit owner to be directly and frequently involved in the maintenance and management of the Building;
   c. Defendant wanted "to change the terms of the purchase" as "this late stage" to make her daughter not only a co-habitant of the Unit, which was not stated in the Contract of Sale, but to make her a "co-owner" of the Unit which would require rewriting of the Contract of Sale;
   d. Defendant wanted to "install[] a chair lift" despite this being "a major expense" that "would take up a lot of space and be of no interest or use to the majority" of the other unit owners; and
   e. Defendant planned "to play loud music" that would be disruptive and interfere with neighbors' use and enjoyment of their units.

*See* Email dated January 7, 2025 attached hereto as <u>Exhibit B</u>, at 2.

16

Case 2:25-cv-02131-EMC Document Filed 04/16/25 Page 20 of 62 Page ID #: 99

76. Plaintiffs complied with all of their contractual obligations under the Contract of Sale.

77. Notwithstanding Plaintiffs' good faith and compliance with the Contract of Sale, the Corporation rejected Defendant's Application as a result of Defendant's bad faith and misrepresentations, preventing the sale from ever being consummated.

78. Among other provisions, the Contract of Sale, Sections 6.1-6.2.1, provides as follows:

> 6.1 This sale is subject to the unconditional consent of the Corporation.
> 6.2 Purchaser shall in good faith:
> 6.2.l submit to the Corporation or the Managing Agent an application with respect to this sale on the form required by the Corporation, containing such data and together with such documents as the Corporation requires, and pay the applicable fees and charges that the Corporation imposes upon Purchaser. All of the foregoing shall be submitted within 10 business days after the Delivery Date, or, if ¶ 1.20.1 or 1.20.2 applies and the Loan Commitment Letter is required by the Corporation, within 3 business days after the earlier of (i) the Loan Commitment Date (defined in ¶ 1.21) or (ii) the date of receipt of the Loan Commitment Letter (defined in ¶ 18.1.2);
> 6.2.2 attend (and cause any Proposed Occupant to attend) one or more personal interviews, as requested by the Corporation;

Ex. A, Contract of Sale, Secs. 6.1-6.2.2.

79. Indeed, the Contract of Sale explicitly states that the prospective Purchaser's bad faith is a basis for default under the contract.

> 6.4 *If such consent is refused, or not given, due to Purchaser's bad faith conduct. Purchaser shall be in default and ¶ 13.1 shall govern.*

Ex. A, Contract of Sale, Sec. 6.4 (emphasis added).

80. Section 13.1 of the Contract, in turn, provides that such a default by Defendant, as the prospective Purchaser, will entitle Plaintiffs, as the prospective Sellers, to retain the Deposit as liquidated damages.

17

Case 2:25-cv-02131-EM16005 Document Filed 04/10/25 47 Page 21 Page 67 Page ID #: 100

> 13.l In the event of a default or misrepresentation by Purchaser, Seller's sole and exclusive remedies shall be to cancel this Contract, *retain the Contract Deposit as liquidated damages* and, if applicable, Seller may enforce the indemnity in ¶ 13.3 as to brokerage commission or sue under ¶ 13.4. Purchaser prefers to limit Purchaser's exposure for actual damages to the amount of the Contract Deposit, which Purchaser agrees constitutes a fair and reasonable amount of compensation for Seller's damages under the circumstances and is not a penalty. The principles of real property law shall apply to this liquidated damages provision.

Ex. A, Contract of Sale, Sec. 13.1.

81.     In addition, Section 40 of the Seller's Rider of the Contract of Sale provides as follows:

> 40. <u>Waiver of Trial by Jury</u>. Both Purchaser and Seller irrevocably waive the right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Contract. In connection with any litigation arising out of this Contract, the prevailing party shall be entitled to recover all costs thereof, including, without limitation, reasonable attorneys' fees and disbursements for services rendered in connection with such litigation.

Ex. A, Contract of Sale, Seller's Rider Sec. 40.

82.     As a result of the foregoing, Plaintiffs have suffered damages, to be recovered through retention of the Deposit of $172,500.00, in addition to interest accrued and accruing from the date of Defendant's breach of the Contract of Sale, as well as costs and fees, including reasonable attorneys' fees, in an amount to be determined at trial.

### AS AND FOR A SECOND CAUSE OF ACTION
*Declaratory Judgment*

83.     Plaintiffs repeat and reallege each and every allegation as stated in the foregoing paragraphs as if fully set forth herein.

84.     Plaintiffs and Defendant entered into the Contract of Sale for the sale and transfer of the Unit.

18

85.     Plaintiffs performed all of their obligations under the Contract of Sale to the extent possible and required by law and under the Contract of Sale.

86.     As set forth herein, Defendant breached the Contract of Sale by, *inter alia*, acting in bad faith to deliberately sabotage the chances of the Corporation approving the sale through making a series of claims in the interview process she knew would lead to Corporation to deny her Application as a prospective purchaser as well as making misrepresentations in the Contract of Sale she later sought to change or renege upon after the fact.

87.     These claims made by Defendant in the interview process intentionally seeking disapproval of her Application and thereby preventing the sale from ever closing include, but are not limited to:

a. Defendant planned to have a "large, anxious dog" whom she deliberately said "barks a lot";
b. Defendant planned "to be absent a lot", frequently in California to be the "primary caregiver" for her elderly parents, despite the need for any unit owner to be directly and frequently involved in the maintenance and management of the Building;
c. Defendant wanted "to change the terms of the purchase" as "this late stage" to make her daughter not only a co-habitant of the Unit, which was not stated in the Contract of Sale, but to make her a "co-owner" of the Unit which would require rewriting of the Contract of Sale;
d. Defendant wanted to "install[] a chair lift" despite this being "a major expense" that "would take up a lot of space and be of no interest or use to the majority" of the other unit owners; and
e. Defendant planned "to play loud music" that would be disruptive and interfere with neighbors' use and enjoyment of their units.

*See* Email dated January 7, 2025 attached hereto as <u>Exhibit B</u>, at 2.

88.     Notwithstanding Plaintiffs' good faith and compliance with the Contract of Sale, the Corporation rejected Defendant's Application as a result of Defendant's bad faith and misrepresentations, preventing the sale from ever being consummated.

19

89.     Among other provisions, the Contract of Sale, Sections 6.1-6.2.1, provides as

follows:

> 6.2 This sale is subject to the unconditional consent of the Corporation.
> 6.2 Purchaser shall in good faith:
> 6.2.1 submit to the Corporation or the Managing Agent an application with respect to this sale on the form required by the Corporation, containing such data and together with such documents as the Corporation requires, and pay the applicable fees and charges that the Corporation imposes upon Purchaser. All of the foregoing shall be submitted within 10 business days after the Delivery Date, or, if ¶ 1.20.1 or 1.20.2 applies and the Loan Commitment Letter is required by the Corporation, within 3 business days after the earlier of (i) the Loan Commitment Date (defined in ¶ 1.21) or (ii) the date of receipt of the Loan Commitment Letter (defined in ¶ 18.1.2);
> 6.2.2 attend (and cause any Proposed Occupant to attend) one or more personal interviews, as requested by the Corporation;

Ex. A, Contract of Sale, Secs. 6.1-6.2.2.

90.     Indeed, the Contract of Sale explicitly states that the prospective Purchaser's bad

faith is a basis for default under the contract.

> 6.4 *If such consent is refused, or not given, due to Purchaser's bad faith conduct. Purchaser shall be in default and ¶ 13.1 shall govern.*

Ex. A, Contract of Sale, Sec. 6.4 (emphasis added).

91.     Section 13.1 of the Contract, in turn, provides that such a default by Defendant, as

the prospective Purchaser, will entitle Plaintiffs, as the prospective Sellers, to retain the Deposit

as liquidated damages.

> 13.1 In the event of a default or misrepresentation by Purchaser, Seller's sole and exclusive remedies shall be to cancel this Contract, *retain the Contract Deposit as liquidated damages* and, if applicable, Seller may enforce the indemnity in ¶ 13.3 as to brokerage commission or sue under ¶ 13.4. Purchaser prefers to limit Purchaser's exposure for actual damages to the amount of the Contract Deposit, which Purchaser agrees constitutes a fair and reasonable amount of compensation for Seller's damages under the circumstances and is not a penalty. The principles of real property law shall apply to this liquidated damages provision.

Ex. A, Contract of Sale, Sec. 13.1.

20

Case 2:25-cv-02131-EK-LGD  Document 1  Filed 04/16/25  Page 24 of 56 PageID #: 103

92.    Pursuant to Section 13.1 of the Contract of Sale, Plaintiffs are entitled to retain the Deposit of $172,500.00.

93.    In both the January 24, 2025 and February 12, 2025 letters, Plaintiff made due demand to retain the Deposit as a result of Defendant's breaches of the Contract of Sale. *See* Exhibits C and D.

94.    Despite Plaintiffs' demand via these two letters, Defendant has refused to agree to Plaintiffs' retention of the Deposit – and is thus acting in breach of the Contract in her refusal to do so.

95.    The present dispute presents a justiciable controversy in which the issues are present, real, definite, and substantial and affect existing legal relations between Plaintiffs and Defendant. Without a declaration of rights, Plaintiffs could be unable to obtain the Deposit from the escrow agent that, in light of Defendant's breach of the Contract of Sale, rightfully belongs to Plaintiffs.

96.    Therefore, Plaintiffs seek a declaratory judgment that (a) Plaintiffs are entitled to the retention of the Contract Deposit pursuant to sections 6.2 and 13.1 of the Contract of Sale, (b) Defendant has no valid claim to the Deposit that properly belongs to Plaintiffs, and (c) the escrow agent currently holding the Deposit must forthwith transfer the Deposit to Plaintiffs.

21

Case 2:25-cv-02813-EK-LKE Document 1 Filed 04/16/25 Page 24 of 24 PageID #: 104

**WHEREFORE**, Plaintiffs demand judgment against Defendant as follows:

(a) on the first cause of action against Defendant for breach of the Contract of Sale for the Deposit of $172,500.00, in addition to interest accrued and accruing from the date of Defendant's breach of the Contract of Sale, as well as costs and fees, including reasonable attorneys' fees, in an amount to be determined at trial;

(b) on the second cause of action against Defendant, a declaration that (i) Plaintiffs are entitled to the retention of the Contract Deposit; (ii) Defendant has no valid claim to the Deposit that properly belongs to Plaintiffs; and (iii) the escrow agent currently holding the Deposit must immediately transfer the Deposit to Plaintiffs; and

(c) the costs and disbursements of this action, and for such other and further relief as the Court may deem just and proper.

Dated: New York, New York
February 26, 2025

**KISHNER MILLER HIMES, P.C.**

By:_____/s/ Ryan O. Miller_____
      Ryan O. Miller
      Eric B. LaMons
40 Fulton Street, 12th Floor
New York, New York 10038
(212) 585-3425

*Attorneys for Plaintiffs*
*Meet Doshi and Brittany Doshi*

22

Case 2:25-cv-02131-EMLG Document 1 Filed 04/16/25 Page 26 of 63 PageID #: 105

# EXHIBIT A

FILED: KINGS COUNTY CLERK 02/25/2025 05:17 PM INDEX NO. 506732/2025
NYSCEF DOC. NO. 2 Case 1:25-cv-02513-HG Document 1 Filed 04/10/25 Page 27 of 63 PageID #: 106 RECEIVED NYSCEF: 02/25/2025

Docusign Envelope ID: 91D57C44-23F1-467E-A6B7-F6D9F3DEAA96

Contract of sale cooperative apartment, 7-2001
Prepared by the Committee on Condominium and Cooperative of the Real Property Section of the New York State Bar Association

## CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

## Contract of Sale - Cooperative Apartment

This Contract is made as of October **18**, 2024 between the "Seller" and the "Purchaser" identified below.

### 1 Certain Definitions and Information
#### 1.1 The "Parties" are:

**1.1.1 "Seller":** Brittany Parisi Doshi & Meet Bimal Doshi
*Prior names used by Seller:* Brittany Anne Parisi
*Address: 99 State Street, Unit 4E, Brooklyn, NY 11201*

S.S. No.:

**1.1.2 "Purchaser":** Catherine Kim Lee

Address:

S.S. No.:

1.2 The "Attorneys" are *(name, firm name, address and telephone, fax):*

1.2.1 "Seller's Attorney"
Jacqueline Newmark, Esq.
Wexler & Kaufman, PLLC
462 Seventh Avenue, 12th floor
New York, NY 10018
718 797 4636
jnewmark@wlklegal.com
1.3 The "Escrowee" is *the Seller's* Attorney.

1.2.2 "Purchaser's Attorney"
Seth Ben-Ezra, Esq.
Seth I. Ben-Ezra, P.C.
425 Broadhollow Road, Suite 220
Melville, NY 11747
516-577-9000
seth@benezralaw.com

1.4 The Managing Agent is *(name, address and telephone, fax):Self-Managed- Mary Warner; marywarner@gmail.com*
1.5 The real estate "Broker(s)" (see ¶ 12) is/are: Alex Newman/Amit Golriz/Gaurab Reja of Serhant & Sarah Sachs of Keller Williams NYC
1.6 The name of the cooperative housing corporation ("Corporation") is: 99 State Associates, Inc.
1.7 The "Unit" number is: 4E
1.8 The Unit is located in "Premises" known as: 99 State Street, Brooklyn, NY 11201
1.9 The "Shares" are the 20 shares of the Corporation allocated to the Unit.
1.10 The "Lease" is the Corporation's proprietary lease or occupancy agreement for the Unit, given by the Corporation which expires on
1.11 "Personalty" is the following personal property, to the extent existing in the Unit on the date hereof: the refrigerators, freezers, ranges, ovens, built-in microwave ovens, dishwashers, garbage disposal units, cabinets and counters, lighting fixtures, chandeliers, wall-to-wall carpeting, plumbing and heating fixtures, central air-conditioning and/or window or sleeve units, washing machines, dryers, screens and storm windows, window treatments, switch plates, door hardware, mirrors, built-ins not excluded in ¶ 1.12 and
1.12 Specifically excluded from this sale is all personal property not included in ¶ 1.11 and
1.13 The sale DOES include Seller's interest in storage area in cellar
("Included Interests")
1.14 The "Closing" is the transfer of ownership of the Shares and Lease.
1.15 The date scheduled for Closing is on or about February 1, 2025 ("Scheduled Closing Date") at Corporation Attorney's office (See ¶¶ 9 and 10)
1.16 The "Purchase Price" is: $1,725,000.00
1.16.1 The "Contract Deposit" is: $172,500.00

1.16.2 The "Balance" of the Purchase Price due at Closing is: $1,552,500.00 (See ¶ 2.2.2)
1.17 The monthly "Maintenance" charge is $1,216.00 (purchaser to independently verify) (See ¶ 4)
1.18 The "Assessment", if any, payable to the Corporation, at the date of this Contract is $N/A , payable as follows:
1.19 Seller shall pay the Corporation's flip tax, transfer fee (apart from the transfer agent fee) and/or waiver of option fee ("Flip Tax"), if any.
1.20 Financing Options (Delete two of the following ¶¶ 1.20.1, 1.20.2 or 1.20.3)
~~1.20.1 Purchaser may apply for financing in connection with this sale and Purchaser's obligation to purchase under this Contract is contingent upon issuance of a Loan Commitment Letter by the Loan Commitment Date (¶18.1.2).~~
~~1.20.2 Purchaser may apply for financing in connection with this sale but Purchaser's obligation to purchase under this Contract is not contingent upon issuance of a Loan Commitment letter.~~
1.20.3 Purchaser shall not apply for financing in connection with this sale.
~~1.21 If ¶ 1.20.1 or 1.20.2 applies, the "Financing Terms" for ¶ 18 are: a loan of $_____ for a term of 30 years or such lesser amount or shorter term as applied for or acceptable to Purchaser; and the "Loan Commitment Date" for ¶ 18 is 30 calendar days after the Delivery Date.~~
1.22 The "Delivery Date" of this Contract is the date on which a fully executed counterpart of this Contract is deemed given to and received by Purchaser or Purchaser's Attorney as provided in ¶ 17.3.
1.23 All "Proposed Occupants" of the Unit are: Purchaser
1.23.1 persons and relationship to Purchaser:
1.23.2 pets:
1.24 The Contract Deposit shall be held in AN IOLA escrow account. If the account is a non- IOLA account then interest shall be paid to the Party entitled to the Contract Deposit. The Party receiving the interest shall pay any income taxes thereon.

The escrow account shall be a segregated bank account at Depository: First Horizon Bank
Address: 165 Madison Avenue, Memphis, TN 38103 (See ¶ 27)
1.25 This Contract IS continued on attached rider(s).

**2 Agreement to Sell and Purchase; Purchase Price; Escrow**
2.1 Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Seller's Shares, Lease, Personalty and any Included Interests and all other items included in this sale, for the Purchase Price and upon the terms and conditions set forth in this Contract.
2.2 The Purchase Price is payable to Seller by Purchaser as follows:
2.2.1 the Contract Deposit at the time of signing this Contract by Purchaser's good check to the order of Escrowee; and
2.2.2 the Balance at Closing, only by cashier's or official bank check or certified check of Purchaser payable to the direct order of Seller. The check(s) shall be drawn on and payable by a branch of a commercial or savings bank, savings and loan association or trust company located in the same City or County as the Unit. Seller may direct, on reasonable Notice (defined in ¶ 17) prior to Closing, that all or a portion of the Balance shall be made payable to persons other than Seller (see ¶ 17.7).

**3 Personalty**
3.1 Subject to any rights of the Corporation or any holder of a mort-gage to which the Lease is subordinate, this sale includes all of the Seller's interest, if any, in the Personalty and the Included Interests.
3.2 No consideration is being paid for the Personalty or for the Included Interests; nothing shall be sold to Purchaser if the Closing does not occur.
3.3 Prior to Closing, Seller shall remove from the Unit all the furniture, furnishings and other property not included in this sale, and repair any damage caused by such removal.

**4 Representations and Covenants**
4.1 Subject to any matter affecting title to the Premises (as to which Seller makes no representations or covenants), Seller represents and covenants that:
4.1.1 Seller is, and shall at Closing be, the sole owner of the Shares, Lease, Personalty and Included Interests, with the full right, power and authority to sell and assign them. Seller shall make timely provision to satisfy existing security interest(s) in the Shares and Lease and have the same delivered at Closing (See ¶10.1);
4.1.2 the Shares were duly issued, fully paid for and are non-assessable;
4.1.3 the Lease is, and will at Closing be, in full force and effect and no notice of default under the Lease is now or will at Closing be in effect;
4.1.4 the Maintenance and Assessments payable as of the date hereof are as specified in ¶ 1.17 and 1.18;
4.1.5 as of this date, Seller neither has actual knowledge nor has received any written notice of any increase in Maintenance or any Assessment which has been adopted by the Board of Directors of the Corporation and is not reflected in the amounts set forth in ¶¶ 1.17and 1.18;
4.1.6 Seller has not made any material alterations or additions to the Unit without any required consent of the Corporation or, to Seller's actual knowledge, without compliance with all applicable law. This provision shall not survive Closing.
4.1.7 Seller has not entered into, shall not enter into, and has no actual knowledge of any agreement (other than the Lease) affecting title to the Unit or its use and/or occupancy after Closing, or which would be binding on or adversely affect Purchaser after Closing (e.g. a sublease or alteration agreement);
4.1.8 Seller has been known by no other name for the past 10 years except as set forth in ¶ 1.1.1.
4.1.9 at Closing in accordance with ¶ 15.2:

4.1.9.1 there shall be no judgments outstanding against Seller which have not been bonded against collection out of the Unit ("Judgments");
4.1.9.2 the Shares, Lease, Personalty and any Included Interests shall be free and clear of liens (other than the Corporation's general lien on the Shares for which no monies shall be owed), encumbrances and adverse interests ("Liens");
4.1.9.3 all sums due to the Corporation shall be fully paid by Seller to the end of the payment period immediately preceding the date of Closing;
4.1.9.4 Seller shall not be indebted for labor or material which might give rise to the filing of a notice of mechanic's lien against the Unit or the Premises; and
4.1.9.5 no violations shall be of record which the owner of the Shares and Lease would be obligated to remedy under the Lease.
4.2 Purchaser represents and covenants that:
4.2.1 Purchaser is acquiring the Shares and Lease for residential occupancy of the Unit solely by the Proposed Occupants identified in ¶ 1.23
4.2.2 Purchaser is not, and within the past 7 years has not been, the subject of a bankruptcy proceeding;
4.2.3 if ¶ 1.20.3 applies, Purchaser shall not apply for financing in connection with this purchase.
4.2.4 Each individual comprising Purchaser is over the age of 18 and is purchasing for Purchaser's own account (beneficial and of record);
4.2.5 Purchaser shall not make any representations to the Corporation contrary to the foregoing and shall provide all documents in support thereof required by the Corporation in connection with Purchaser's application for approval of this transaction; and
4.2.6 there are not now and shall not be at Closing any unpaid tax liens or monetary judgments against Purchaser.
4.3 Each Party covenants that its representations and covenants contained in ¶ 4 shall be true and complete at Closing and, except for ¶ 4.1.6, shall survive Closing but any action based thereon must be instituted within one year after Closing.

**5 Corporate Documents**
Purchaser has examined and is satisfied with, or (except as to any matter represented in this Contract by Seller) accepts and assumes the risk of not having examined, the Lease, the Corporation's Certificate of Incorporation, By-laws, House Rules, minutes of shareholders' and directors' meetings, most recent audited financial statement and most recent statement of tax deductions available to the Corporation's shareholders under Internal Revenue Code ("IRC") §216 (or any successor statute).

**6 Required Approval and References**
6.1 This sale is subject to the unconditional consent of the Corporation.
6.2 Purchaser shall in good faith:
6.2.1 submit to the Corporation or the Managing Agent an application with respect to this sale on the form required by the Corporation, containing such data and together with such documents as the Corporation requires, and pay the applicable fees and charges that the Corporation imposes upon Purchaser. All of the foregoing shall be submitted within 10 business days after the Delivery Date, or, if ¶ 1.20.1 or 1.20.2 applies and the Loan Commitment Letter is required by the Corporation, within 3 business days after the earlier of (i) the Loan Commitment Date (defined in ¶ 1.21) or (ii) the date of receipt of the Loan Commitment Letter (defined in ¶ 18.1.2);
6.2.2 attend (and cause any Proposed Occupant to attend) one or more personal interviews, as requested by the Corporation; and
6.2.3 promptly submit to the Corporation such further references, data and documents reasonably requested by the Corporation.

DocuSign Envelope ID: 91D57C44-23F1-467E-A6B7-F6D9F3DEAA96

6.3 Either Party, after learning of the Corporation's decision, shall promptly advise the other Party thereof. If the Corporation has not made a decision on or before the Scheduled Closing Date, the Closing shall be adjourned for 30 business days for the purpose of obtaining such consent. If such consent is not given by such adjourned date, either Party may cancel this Contract by Notice, provided that the Corporation's consent is not issued before such Notice of cancellation is given. If such consent is refused at any time, either Party may cancel this Contract by Notice. In the event of cancellation pursuant to this ¶ 6.3, the Escrowee shall refund the Contract Deposit to Purchaser.

6.4 If such consent is refused, or not given, due to Purchaser's bad faith conduct. Purchaser shall be in default and ¶ 13.1 shall govern.

**7 Condition of Unit and Personality; Possession**

7.1 Seller makes no representation as to the physical condition or state of repair of the Unit, the Personalty, the Included Interests or the Premises. Purchaser has inspected or waived inspection of the Unit, the Personalty and the Included Interests and shall take the same "as is", as of the date of this Contract, except for reasonable wear and tear. However, at the time of Closing, the appliances shall be in working order and required smoke detector(s) shall be installed and operable.

7.2 At Closing, Seller shall deliver possession of the Unit, Personalty and Included Interests in the condition required by ¶ 7.1, broom-clean, vacant and free of all occupants and rights of possession.

**8 Risk of Loss**

8.1 The provisions of General Obligations Law § 5-1311, as modified herein, shall apply to this transaction as if it were a sale of realty. For purposes of this paragraph, the term "Unit" includes built-in Personalty.

8.2 Destruction shall be deemed "material" under GOL § 5-1311, if the reasonably estimated cost to restore the Unit shall exceed 5% of the Purchase Price.

8.3 In the event of any destruction of the Unit or the Premises, when neither legal title nor the possession of the Unit has been transferred to Purchaser, Seller shall give Notice of the loss to Purchaser ("Loss Notice") by the earlier of the date of Closing or 7 business days after the date of the loss.

8.4 If there is material destruction of the Unit without fault of Purchaser, this Contract shall be deemed canceled in accordance with ¶ 16.3, unless Purchaser elects by Notice to Seller to complete the purchase with an abatement of the Purchase Price; or

8.5 Whether or not there is any destruction of the Unit, if without fault of Purchaser, more than 10% of the units in the Premises are rendered uninhabitable, or reasonable access to the Unit is not available, then Purchaser shall have the right to cancel this Contract in accordance with ¶ 16.3 by Notice to Seller.

8.6 Purchaser's Notice pursuant to ¶ 8.4 or ¶ 8.5 shall be given within 7 business days following the giving of the Loss Notice except that if Seller does not give a Loss Notice, Purchaser's Notice may be given at any time at or prior to Closing.

8.7 In the event of any destruction of the Unit, Purchaser shall not be entitled to an abatement of the Purchase Price (i) that exceeds the reasonably estimated cost of repair and restoration or (ii) for any loss that the Corporation is obliged to repair or restore; but Seller shall assign to Purchaser, without recourse, Seller's claim, if any, against the Corporation with respect to such loss.

**9 Closing Location**

The Closing shall be held at the location designated by the Corporation or, if no such designation is made. at the office of Seller's Attorney.

**10 Closing**

10.1 At Closing, Seller shall deliver or cause to be delivered:

10.1.1 Seller's certificate for the Shares duly endorsed for transfer to Purchaser or accompanied by a separate duly executed stock power to Purchaser, and in either case, with any guarantee of Seller's signature required by the Corporation;

10.1.2 Seller's counterpart original of the Lease, all assignments and assumptions in the chain of title and a duly executed assignment thereof to Purchaser in the form required by the Corporation;

10.1.3 FIRPTA documents required by ¶ 25;

10.1.4 keys to the Unit, building entrance(s), and, if applicable, garage, mailbox, storage unit and any locks in the Unit;

10.1.5. if requested, an assignment to Purchaser of Seller's interest in the Personalty and Included Interests;

10.1.6 any documents and payments to comply with ¶ 15.2

10.1.7 If Seller is unable to deliver the documents required in ¶ 10.1.1 or 10.1.2 then Seller shall deliver or cause to be delivered all documents and payments required by the Corporation for the issuance of a new certificate for the Shares or a new Lease.

10.2 At Closing, Purchaser shall:

10.2.1 pay the Balance in accordance with ¶2.2.2;

10.2.2 execute and deliver to Seller and the Corporation an agreement assuming the Lease, in the form required by the Corporation; and

10.2.3 if requested by the Corporation, execute and deliver counterparts of a new lease substantially the same as the Lease, for the balance of the Lease term, in which case the Lease shall be canceled and surrendered to the Corporation together with Seller's assignment thereof to Purchaser.

10.3 At Closing, the Parties shall complete and execute all documents necessary:

10.3.1 for Internal Revenue Service ("IRS") form 1099-S or other similar requirements;

10.3.2 to comply with smoke detector requirements and any applicable transfer tax filings; and

10.3.3 to transfer Seller's interest, if any, in and to the Personalty and Included Interests.

10.4 Purchaser shall not be obligated to close unless, at Closing, the Corporation delivers:

10.4.1 to Purchaser a new certificate for the Shares in the name of Purchaser; and

10.4.2 a written statement by an officer or authorized agent of the Corporation consenting to the transfer of the Shares and Lease to Purchaser and setting forth the amounts of and payment status of all sums owed by Seller to the Corporation, including Maintenance and any Assessments, and the dates to which each has been paid.

**11 Closing Fees, Taxes and Apportionments**

11.1 At or prior to Closing,

11.1.1 Seller shall pay, if applicable:

11.1.1.1 the cost of stock transfer stamps; and

11.1.1.2 transfer taxes. except as set forth in ¶ 11.1.2.2

11.1.2 Purchaser shall pay, if applicable:

11.1.2.1 any fee imposed by the Corporation relating to Purchaser's financing; and

11.1.2.2 transfer taxes imposed by statute primarily on Purchaser (e.g., the "mansion tax"),

11.2 The Flip Tax, if any, shall be paid by the Party specified in ¶ 1.19.

11.3 Any fee imposed by the Corporation and not specified in this Contract shall be paid by the Party upon whom such fee is expressly imposed by the Corporation, and if no Party is specified by the Corporation, then such fee shall be paid by Seller.

11.4 The Parties shall apportion as of 11:59 P.M. of the day preceding the Closing. the Maintenance, and anyother periodic charges due the Corporation (other than Assessments) and STAR Tax Exemption (if the Unit is the beneficiary of same), based on the number of the days in the month of Closing.

Case 2:25-cv-02021-EM-ommDocument 1-4 Filed 04/14/25 Page 30 of 64 Page ID #: 109
Docusign Envelope ID: 91D57C44-23F1-467E-A6B7-F6D9F3DEAA96

11.5 Assessments, whether payable in a lump sum or installments, shall not be apportioned, but shall be paid by the Party who is the owner of the Shares on the date specified by the Corporation for payment. Purchaser shall pay any installments payable after Closing provided Seller had the right and elected to pay the Assessment in installments.

11.6 Each Party shall timely pay any transfer taxes for which it is primarily liable pursuant to law by cashier's, official bank, certified or attorney's escrow check. This ¶11.6 shall survive Closing.

11.7 Any computational errors or omissions shall be corrected within 6 months after Closing. This ¶11.7 shall survive Closing.

**12 Broker**

12.1 Each Party represents that such Party has not dealt with any person acting as a broker, whether licensed or unlicensed, in connection with this transaction other than the Broker(s) named in ¶ 1.5.

12.2 Seller shall pay the Broker's commission pursuant to a separate agreement The Broker(s) shall not be deemed to be a third-party beneficiary of this Contract.

12.3 This ¶12 shall survive Closing, cancellation or termination of this Contract.

**13 Defaults, Remedies and Indemnities**

13.1 In the event of a default or misrepresentation by Purchaser, Seller's sole and exclusive remedies shall be to cancel this Contract, retain the Contract Deposit as liquidated damages and, if applicable, Seller may enforce the indemnity in ¶ 13.3 as to brokerage commission or sue under ¶ 13.4. Purchaser prefers to limit Purchaser's exposure for actual damages to the amount of the Contract Deposit, which Purchaser agrees constitutes a fair and reasonable amount of compensation for Seller's damages under the circumstances and is not a penalty. The principles of real property law shall apply to this liquidated damages provision.

13.2 In the event of a default or misrepresentation by Seller, Purchaser shall have such remedies as Purchaser is entitled to at law or in equity, including specific performance, because the Unit and possession thereof cannot be duplicated.

13.3 Subject to the provisions of ¶ 4.3, each Party indemnifies and holds harmless the other against and from any claim, judgment, loss, liability, cost or expense resulting from the indemnitor's breach of any of its representations or covenants stated to survive Closing, cancellation or termination of this Contract. Purchaser indemnifies and holds harmless Seller against and from any claim, judgment, loss, liability, cost or expense resulting from the Lease obligations accruing from and after the Closing. Each indemnity includes, without limitation, reasonable attorneys' fees and disbursements, court costs and litigation expenses arising from the defense of any claim and enforcement or collection of a judgment under this indemnity, provided the indemnitee is given Notice and opportunity to defend the claim. This ¶ 13.3 shall survive Closing, cancellation or termination of this Contract.

13.4 In the event any instrument for the payment of the Contract Deposit fails of collection, Seller shall have the right to sue on the uncollected instrument. In addition, such failure of collection shall be a default under this Contract, provided Seller gives Purchaser Notice of such failure of collection and, within 3 business days after Notice is given. Escrowee does not receive from Purchaser an unendorsed good certified check, bank check or immediately available funds in the amount of the uncollected funds. Failure to cure such default shall entitle Seller to the remedies set forth in ¶ 13.1 and to retain all sums as may be collected and/or recovered.

**14 Entire Agreement; Modification**

14.1 All prior oral or written representations, understandings and agreements had between the Parties with respect to the subject matter of this Contract, and with the Escrowee as to ¶ 27, are

merged in this Contract, which alone fully and completely expresses the Parties' and Escrowee's agreement. 14.2 The Attorneys may extend in writing any of the time limitations stated in this Contract. Any other provision of this Contract may be changed or waived only in writing signed by the Party or Escrowee to be charged.

**15 Removal of Liens and Judgments**

15.1 Purchaser shall deliver or cause to be delivered to Seller or Seller's Attorney, not less than 10 calendar days prior to the Scheduled Closing Date a Lien and Judgment search, except that Liens or Judgments first disclosed in a continuation search shall be reported to Seller within 2 business days after receipt thereof, but not later than the Closing. Seller shall have the right to adjourn the Closing pursuant to ¶ 16 to remove any such Liens and Judgments. Failure by Purchaser to timely deliver such search or continuation search shall not constitute a waiver of Seller's covenants in ¶4 as to Liens and Judgments. However, if the Closing is adjourned solely by reason of untimely delivery of the Lien and Judgment search, the apportionments under ¶ 11.3 shall be made as of 11:59 P.M. of the day preceding the Scheduled Closing Date in ¶ 1.15.

15.2 Seller, at Seller's expense, shall obtain and deliver to the Purchaser the documents and payments necessary to secure the release, satisfaction, termination and discharge or removal of record of any Liens and Judgments. Seller may use any portion of the Purchase Price for such purposes.

15.3 This ¶ 15 shall survive Closing.

**16 Seller's Inability**

16.1 If Seller shall be unable to transfer the items set forth in ¶ 2.1 in accordance with this Contract for any reason other than Seller's failure to make a required payment or other willful act or omission, then Seller shall have the right to adjourn the Closing for periods not exceeding 60 calendar days in the aggregate, but not extending beyond the expiration of Purchaser's Loan Commitment Letter, if ¶ 1.20.1 or 1.20.2 applies.

16.2 If Seller does not elect to adjourn the Closing or (if adjourned) on the adjourned date of Closing Seller is still unable to perform, then unless Purchaser elects to proceed with the Closing without abatement of the Purchase Price, either Party may cancel this Contract on Notice to the other Party given at any time thereafter.

16.3 In the event of such cancellation, the sole liability of Seller shall be to cause the Contract Deposit to be refunded to Purchaser and to reimburse Purchaser for the actual costs incurred for Purchase's lien and title search, if any.

**17 Notices and Contract Delivery**

17.1 Any notice or demand ("Notice") shall be in writing and delivered either by hand. Overnight delivery or certified or registered mail, return receipt requested, to the Party and simultaneously, in like manner, to such Party's Attorney, if any, and to Escrowee at their respective addresses or to such other address as shall hereafter be designated by Notice given pursuant to this ¶ 17.

17.2 The Contract may be delivered as provided in ¶

17.1 or by ordinary mail.

17.3 The Contract or each Notice shall be deemed given and received:

17.3.1 on the day delivered by hand;

17.3.2 on the business day following the date sent by overnight delivery;

17.3.3 on the 5th business day following the date sent by certified or registered mail; or

17.3.4 as to the Contract only, 3 business days following the date of ordinary mailing.

17.4 A Notice to Escrowee shall be deemed given only upon actual receipt by Escrowee.

17.5 The Attorneys are authorized to give and receive any Notice on behalf of their respective clients.

Case 25-05... EMO... Document... Filed 04/06/25... Page 62 of 239 ID #: 110
DocuSign Envelope ID: 9YD57C44-23F1-467E-A6B7-F6D9F3DEAA96

17.6 Failure or refusal to accept a Notice shall not invalidate the Notice.

17.7 Notice pursuant to ¶¶ 2.2.2 and 13.4 may be delivered by confirmed facsimile to the Party's Attorney and shall be deemed given when transmission is confirmed by sender's facsimile machine.

18 Financing Provisions

18.1 The provisions of ¶¶ 18.1 and 18.2 are applicable only if ¶ 1.20.1 or 1.20.2 applies.

18.1.1 An "Institutional Lender" is any of the following that is authorized under Federal or New York State law to issue a loan secured by the Shares and Lease and is currently extending similarly secured loan commitments in the county in which the Unit is located: a bank, savings bank, savings and loan association, trust company, credit union of which Purchaser is a member, mortgage banker, insurance company or governmental entity.

18.1.2 A "Loan Commitment Letter" is a written offer from an Institutional Lender to make a loan on the Financing Terms (see ¶ 1.21) at prevailing fixed or adjustable interest rates and on other customary terms generally being offered by Institutional Lenders making cooperative share loans. An offer to make a loan conditional upon obtaining an appraisal satisfactory to the Institutional Lender shall not become a Loan Commitment Letter unless and until such condition is met. An offer conditional upon any factor concerning Purchaser (e.g. sale of current home, payment of outstanding debt, no material adverse change in Purchaser's financial condition, etc.) is a Loan Commitment Letter whether or not such condition is met. Purchaser accepts the risk that, and cannot cancel this Contract if, any condition concerning Purchaser is not met.

18.2 Purchaser, directly or through a mortgage broker registered pursuant to Article 12-D of the Banking Law, shall diligently and in good faith:

18.2.1 apply only to an Institutional Lender for a loan on the Financing Terms (see ¶ 1.21) on the form required by the Institutional Lender containing truthful and complete information; and submit such application together with such documents as the Institutional Lender requires, and pay the applicable fees and charges of the Institutional Lender, all of which shall be performed within 5 business days after the Delivery Date;

18.2.2 promptly submit to the Institutional Lender such further references, data and documents requested by the Institutional Lender; and

18.2.3 accept a Loan Commitment Letter meeting the Financing Terms and comply with all requirements of such Loan Commitment Letter (or any other loan commitment letter accepted by Purchaser) and of the Institutional Lender in order to close the loan; and

18.2.4 furnish Seller with a copy of the Loan Commitment Letter promptly after Purchaser's receipt thereof.

18.2.5 Purchaser is not required to apply to more than one Institutional Lender.

18.3 If ¶ 1.20.1 applies, then

18.3.1 provided Purchaser has complied with all applicable provisions of ¶ 18.2 and this ¶ 18.3, Purchaser may cancel this Contract as set forth below, if:

18.3.1.1 any Institutional Lender denies Purchaser's application in writing prior to the Loan Commitment Date (see ¶ 1.21); or

18.3.1.2 a Loan Commitment Letter is not issued by the Institutional Lender on or before the Loan Commitment Date; or

18.3.1.3 any requirement of the Loan Commitment Letter other than one concerning Purchaser is not met (e.g. failure of the Corporation to execute and deliver the Institutional Lender's recognition agreement or other document, financial condition of the Corporation, owner occupancy quota, etc.); or

18.3.1.4 (i) the Closing is adjourned by Seller or the Corporation for more than 30 business days from the Scheduled Closing Date and (ii) the Loan Commitment Letter expires on a date more than 30 business days after the Scheduled Closing Date and before the new date set for Closing pursuant to this paragraph and (iii) Purchaser is unable in good faith to obtain from the Institutional Lender an extension of the Loan Commitment Letter or a new Loan Commitment Letter on the Financing Terms without paying additional fees to the Institutional Lender, unless Seller agrees, by Notice to Purchaser within 5 business days after receipt of Purchaser's Notice of cancellation on such ground, that Seller shall pay such additional fees and Seller pays such fees when due. Purchaser may not object to an adjournment by Seller for up to 30 business days solely because the Loan Commitment Letter would expire before such adjourned Closing date.

18.3.2 Purchaser shall deliver Notice of cancellation to Seller within 5 business days after the Loan Commitment Date if cancellation is pursuant to ¶ 18.3.1.1 or 18.3.1.2 and on or prior to the Scheduled Closing Date if cancellation is pursuant to ¶ 18.3.1.3 or 18.3.1.4.

18.3.3 If cancellation is pursuant to ¶ 18.3.1.1, then Purchaser shall deliver to Seller, together with Purchaser's Notice, a copy of the Institutional Lender's written denial of Purchaser's loan application. If cancellation is pursuant to ¶ 18.3.1.3, then Purchaser shall deliver to Seller together with Purchaser's Notice evidence that a requirement of the Institutional Lender was not met.

18.3.4 Seller may cancel this Contract by Notice to Purchaser, sent within 5 days after the Loan Commitment Date, if Purchaser shall not have sent by then either (i) Purchaser's Notice of cancellation or (ii) a copy of the Loan Commitment Letter to Seller, which cancellation shall become effective if Purchaser does not deliver a copy of such Loan Commitment Letter to Seller within 10 business days after the Loan Commitment Date.

18.3.5 Failure by either Purchaser or Seller to deliver Notice of cancellation as required by this ¶ 18.3 shall constitute a waiver of the right to cancel under this ¶ 18.3.

18.3.6 If this Contract is canceled by Purchaser pursuant to this ¶ 18.3, then thereafter neither Party shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract, except that the Contract Deposit shall be promptly refunded to Purchaser and except as set forth in ¶ 12. If this Contract is canceled by Purchaser pursuant to ¶ 18.3.1.4, then Seller shall reimburse Purchaser for any non-refundable financing and inspection expenses and other sums reimbursable pursuant to ¶ 16.

18.3.7 Purchaser cannot cancel this Contract pursuant to ¶ 18.3.1.4 and cannot obtain a refund of the Contract Deposit if the Institutional Lender fails to fund the loan:

18.3.7.1 because a requirement of the Loan Commitment Letter concerning Purchaser is not met (e.g., Purchaser's financial condition or employment status suffers an adverse change; Purchaser fails to satisfy a condition relating to the sale of an existing residence, etc.) or

18.3.7.2 due to the expiration of a Loan Commitment Letter issued with an expiration date that is not more than 30 business days after the Scheduled Closing Date.

**19 Singular/Plural and Joint/Several**

The use of the singular shall be deemed to include the plural and vice versa, whenever the context so requires. If more than one person constitutes Seller or Purchaser, their obligations as such Party shall be joint and several.

**20 No Survival**

No representation and/or covenant contained herein shall survive Closing except as expressly provided. Payment of the Balance shall constitute a discharge and release by Purchaser of

FILED: KINGS COUNTY CLERK 02/25/2025 05:17 PM  INDEX NO. 506732/2025
NYSCEF DOC. NO. 1  RECEIVED NYSCEF: 02/25/2025

DocuSign Envelope ID: 59D57C44-23F1-467E-A6B7-F6D9F3DEAA96

all of Seller's obligations hereunder except those expressly stated to survive Closing.

**21 Inspections**
Purchaser and Purchaser's representatives shall have the right to inspect the Unit within 48 hours prior to Closing, and at other reasonable times upon reasonable request to Seller.

**22 Governing Law and Venue**
This Contract shall be governed by the laws of the State of New York without regard to principles of conflict of laws. Any action or proceeding arising out of this Contract shall be brought in the county or Federal district where the Unit is located and the Parties hereby consent to said venue.

**23 No Assignment by Purchaser; Death of Purchaser**
23.1 Purchaser may not assign this Contract or any of Purchaser's rights hereunder. Any such purported assignment shall be null and void.
23.2 This Contract shall terminate upon the death of all persons comprising Purchaser and the Contract Deposit shall be refunded to the Purchaser. Upon making such refund and reimbursement, neither Party shall have any further liability or claim against the other hereunder, except as set forth in ¶ 12.

**24 Cooperation of Parties**
24.1 The Parties shall each cooperate with the other, the Corporation and Purchaser's Institutional Lender and title company, if any, and obtain, execute and deliver such documents as are reasonably necessary to consummate this sale.
24.2 The Parties shall timely file all required documents in connection with all governmental filings that are required by law. Each Party represents to the other that its statements in such filings shall be true and complete. This ¶ 24.2 shall survive Closing.

**25 FIRPTA**
The parties shall comply with IRC §§ 897, 1445 and the regulations thereunder as same may be amended ("FIRPTA"). If applicable, Seller shall execute and deliver to purchaser at Closing a Certification of Non- Foreign Status ("CNS") or deliver a Withholding Certificate from the IRS. If Seller fails to deliver a CNS or a Withholding Certificate, Purchaser shall withhold from the Balance, and remit to the IRS, such sum as may be required by law. Seller hereby waives any right of action against Purchaser on account of such withholding and remittance. This ¶ 25 shall survive Closing.

**26 Additional Requirements**
26.1 Purchaser shall not be obligated to close unless all of the following requirements are satisfied at the time of the Closing:
26.1.1 the Corporation is in good standing;
26.1.2 the Corporation has fee or leasehold title to the Premises, whether or not marketable or insurable; and
26.1.3 there is no pending *in rem* action, tax certificate/lien sale or foreclosure action of any underlying mortgage affecting the Premises.
26.2 If any requirement in ¶ 26.1 is not satisfied at the time of the Closing, Purchaser shall give Seller Notice and if the same is not satisfied within a reasonable period of time thereafter, then either Party way cancel this Contract (pursuant to ¶ 16.3) by Notice.

**27 Escrow Terms**
27.1 The Contract Deposit shall be deposited by Escrowee in an escrow account as set forth in ¶ 1.24 and the proceeds held and disbursed in accordance with the terms of this Contract. At Closing, the Contract Deposit shall be paid by Escrowee to Seller. If the Closing does not occur and either Party gives

Notice to Escrowee demanding payment of the Contract Deposit, Escrowee shall give prompt Notice to the other Party of such demand. If Escrowee does not receive a Notice of objection to the proposed payment from such other Party within 10 business days after the giving of Escrowee's Notice, Escrowee is hereby authorized and directed to make such payment to the demanding party. If Escrowee does receive such a Notice of objection within said period, or if for any reason Escrowee in good faith elects not to make such payment, Escrowee may continue to hold the Contract Deposit until otherwise directed by a joint Notice by the Parties or a final, non-appealable judgment, order or decree of a court of competent jurisdiction. However, Escrowee shall have the right at any time to deposit the Contract Deposit and the interest thereon, if any, with the clerk of a court in the county as set forth in ¶ 22 and shall give Notice of such deposit to each Party. Upon disposition of the Contract Deposit and interest thereon, if any, in accordance with this ¶ 27, Escrowee shall be released and discharged of all escrow obligations and liabilities.
27.2 The Party whose Attorney is Escrowee shall be liable for loss of the Contract Deposit. If the Escrowee is Seller's attorney, then Purchaser shall be credited with the amount of the contract Deposit at Closing.
27.3 Escrowee will serve without compensation. Escrowee is acting solely as a stakeholder at the Parties' request and for their convenience. Escrowee shall not be liable to either Party for any act or omission unless it involves bad faith, willful disregard of this Contract or gross negligence. In the event of any dispute, Seller and Purchaser shall jointly and severally (with right of contribution) defend (by attorneys elected by Escrowee), indemnify and hold harmless Escrowee from and against any claim, judgment, loss, liability, cost and expenses incurred in connection with the performance of Escrowee's acts or omissions not involving bad faith, willful disregard of this Contract or gross negligence. This indemnity includes, without limitation, reasonable attorneys' fees either paid to retain attorneys or representing the fair value of legal services rendered by Escrowee to itself and disbursements, court costs and litigation expenses.
27.4 Escrowee acknowledges receipt of the Contract Deposit, by check subject to collection.
27.5 Escrowee agrees to the provisions of this ¶ 27.
27.6 If Escrowee is the Attorney for a Party, Escrowee shall be permitted to represent such Party in any dispute or lawsuit.
27.7 This ¶ 27 shall survive Closing, cancellation or termination of this Contract

**28 Margin Headings**
The margin heading do not constitute part of the text of this Contract.

**29 Miscellaneous**
This Contract shall not be binding unless and until Seller delivers a fully executed counterpart of this Contract to Purchaser (or Purchaser's Attorney) pursuant to ¶ 17.2 and 17.3. This Contract shall bind and inure to the benefit of the Parties hereto and their respective heirs, personal and legal representatives and successors in interest.

**30 Lead Paint**
If applicable, the complete and fully executed Disclosure of Information on Lead Based Paint and or Lead-Based Paint Hazards is attached hereto and made a part hereof.

Case 25-02013-lDEM Doc Filed 04/10/25 Page 33 of 64 Page ID #: 112

Docusign Envelope ID: 5YD57C44-23F1-467E-A6B7-F6D9F3DEAA96

In Witness Whereof, the Parties hereto have duly executed this Contract as of the date first above written.

ESCROW TERMS AGREED TO:

_Jacqueline Newmark_
ESCROWEE

SELLER:

Brittany Parisi Doshi
Brittany Parisi Doshi

Meet Bimal Doshi

PURCHASER:

Catherine Kim Lee

Case 2:25-cv-02013-EMI Document 1 Filed 04/10/25 Page 34 of 56 Page ID #: 113
Docusign Envelope ID: 91D57C44-23F1-467E-A6B7-F6D9F3DEAA96

SELLER'S RIDER TO CONTRACT OF SALE

| | |
|---|---|
| Unit: | **4E** |
| Building: | **99 State Street** |
| | **Brooklyn, NY 11201** |
| Seller: | **Brittany Parisi Doshi & Meet Bimal Doshi** |
| Purchaser: | **Catherine Kim Lee** |

31.  Seller's Rider to Control/Standard Form.  In the event of any inconsistencies between the provisions of the Standard Form (defined below) and the provisions of this Seller's Rider, the provisions of this Seller's Rider shall govern and be binding. It is the intention of the parties that the Contract, while computer generated, is the same form prepared by the Committee on Condominium and Cooperatives of the Real Property Section of the New York State Bar Association (7-2001) ("Standard Form"). No changes have been made to the form except for those which are "filled-in", printed in bold, italicized, or handwritten.  Any other changes shall be disregarded in favor of the Standard Form.

32.  Entire Agreement/Full Performance.

    a.  This Contract, as written, contains all the terms of the agreement entered into between the parties, and Purchaser acknowledges that Seller has neither made any representations, nor held out inducements to Purchaser, other than those herein expressed, and Seller is not liable or bound in any manner by expressed or implied warranties, guarantees, promises, statements, representations, or information pertaining to the Unit as to the physical condition, income, expense, operation, or to what use the Unit can be applied, including but not limited to any matter or thing affecting or relating to the Unit except as herein specifically set forth.

    b.  Seller is not liable or bound in any manner by any verbal or written statements, representations, postings, listings, setups, or information pertaining to Seller, the Unit, the Corporation, or the Premises, furnished by any Broker, agent, employee, servant, or other person or otherwise, unless expressly set forth in this Contract. Any representation made by Seller shall not survive the Closing except as expressly set forth in this Contract or at law.

    c.  The acceptance of the Shares and the assumption of the Lease by Purchaser shall be deemed to be a full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Contract, except those provisions which are specifically stated to survive Closing.

33.  Condition of Unit.

    a.  Except as expressly set forth in this Contract, Purchaser is purchasing the Unit and the Personalty in their "as is" as of the date hereof, subject to normal wear and tear between the Delivery Date and the date of Closing.

Docusign Envelope ID: 91D57C44-23F1-467E-A6B7-F6D9F3DEAA96

b. Seller is not obligated to install or replace any equipment or appliance in the Unit or otherwise make any repairs, improvements or decorations except as expressly set forth in this Contract. The value of any non-working appliance or systems as of the Closing shall be based on factors such as its age and condition that have experienced normal use since installation.

c. Seller shall not be required to repaint or refinish the floors, doors, walls, ceilings or other surfaces (collectively, the "Surfaces") in the Unit, except to comply with the express terms of this Contract. Minor markings on the Surfaces, and holes of a minor nature (smaller than a US Dime) from picture hooks and other Personalty removed by Seller shall not be considered damage to the Unit.

d. Any lighting fixtures which are to be removed pursuant to the terms of this Contract shall be replaced with "builder's quality" or "building standard" fixtures.

34. Seller's Representations.

a. Seller makes no representation as to the exact name of the Corporation, which shall be independently verified by Purchaser or Purchaser's Attorney.

b. Seller makes no representations that the Maintenance set forth in Paragraph 1.17 of the Standard Form and/or the Assessment, if any, or the non-existence thereof, as set forth in Paragraph 1.18 of the Standard From will be the same at Closing.

35. Purchaser's Representations.

a. Purchaser represents that to the best of Purchaser's knowledge, that Purchaser (i) has no tax liens or other judgments against the individual(s) comprising Purchaser; (ii) anticipates no liens or judgments to be filed against them, (iii) has never filed a bankruptcy petition; (iv) has never been denied as a purchaser in a cooperative corporation; (v) the financial statement submitted with the offer to purchase the Unit is true and a materially accurate reflection of Purchaser's financial condition and the application for approval will reflect same, subject to market fluctuations.

b. Purchaser shall submit a copy of the application for approval as required in Paragraph 6 of the Standard Form to Seller's Broker for preliminary review before submission to the Managing Agent. Such submission to Seller's Broker shall be deemed compliance with that Paragraph.

Docusign Envelope ID: 91D57C44-23F1-467E-A6B7-F6D9F3DEAA96

Case 2:25-cv-01313-EMP Document Filed 04/16/2025 47 Page 36 Page 36 Page ID #: 115

c. Purchaser represents that Purchaser has or will have at Closing sufficient liquid assets to make all payments due from Purchaser under this Contract and to defray closing costs.

d. Purchaser is not now, nor shall be at any time prior to or at the Closing, a Person with whom a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories (collectively, a "U.S. Person"), is prohibited from transacting business of the type contemplated by this Contract, whether such prohibition arises under United States law, regulation, executive orders or lists published by the Office of Foreign Assets Control, Department of the Treasury ("OFAC"). Neither Purchaser nor any person who owns an interest in Purchaser is now nor shall be at any time prior to or at the Closing, a person with whom a U.S. person, including a "financial institution" as defined in 31 U.S.C. 5312 (a) (z), as periodically amended, is prohibited from transacting business of the type contemplated by this Contract, whether such prohibition arises under United States law, regulation, executive orders and lists published by OFAC or otherwise.

e. Purchaser represents that the Unit will be her primary residence.

36. <u>Broker</u>. Purchaser and Seller each agree to hold harmless and indemnify the other from and against any and all claims, judgments, costs, expenses and liabilities, including reasonable attorney's fees resulting from any breach of the representations set forth in paragraph 12. The provisions of this Paragraph shall survive Closing or the termination of the Contract, whichever shall first occur. The purchaser shall pay the broker commission to its broker, Keller Williams NYC and Seller is only responsible for paying the commission due to Serhant.

37. <u>Waiver</u>. No waiver by either party of any failure or refusal by the other party to comply with its obligations hereunder shall be deemed a waiver of any other or subsequent failure or refusal to so comply.

38. <u>Counterparts</u>. This Contract may be executed in one or more counterparts and via secure electronic signature (i.e. HelloSign, DocuSign, etc.) each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument. The submission of a signed Contract via facsimile, email or similar electronic transmissions shall be considered as originals for purposes of this Contract.

39. <u>Tax Abatement</u>. In the event that, after Closing, there is a credit (either directly by the governmental taxing authority, or indirectly by the Corporation as an abatement to Maintenance or as check to the Purchaser) that in whole or in part relates to the period of time Seller owned the Unit, Purchaser shall be obligated to provide to Seller the pro-rated portion of such credit for the period in which Seller owned the Unit, to the extent said credit is not offset by an assessment. The provisions of this paragraph shall survive the Closing for one (1) year.

Case 25-02031-ESL11   Doc   Filed 04/08/25   Page 37   Page ID #: 116
Docusign Envelope ID: 91D57C44-23F1-467E-A6B7-F6D9F3DEAA96

40. <u>Waiver of Trial by Jury</u>. Both Purchaser and Seller irrevocably waive the right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Contract. In connection with any litigation arising out of this Contract, the prevailing party shall be entitled to recover all costs thereof, including, without limitation, reasonable attorneys' fees and disbursements for services rendered in connection with such litigation.

41. <u>Prohibition Against Money Laundering</u>.  Purchaser has taken, and shall continue to take until the Closing, such measures as are required by applicable law to assure that the funds used to pay to Seller for the Purchase Price are derived: (i) from transactions that do not violate United States law nor, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (ii) from permissible sources under United States law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated. Purchaser is, and will at Closing be, in compliance with any and all applicable provisions of the USA PATRIOT Act of 2001, Pub. L. No. 107-56, the Bank Secrecy Act of 1970, as amended, 31 U.S.C. Section 5311 et. Seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. Seq. the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

42. <u>Time Periods</u>  Any time periods contained in this Contract which contain the language Delivery Date or "from the date hereof" shall be deemed to mean the date that a fully executed counterpart of this Contract has been delivered to Purchaser's Attorney in the manner of delivery set forth herein.

43. <u>Access.</u>  Seller shall allow Purchaser and Purchaser's agents,  to have access to the Unit by appointment with and in the presence of Seller's Broker, a total of not more than three (3) times, not including the pre-Closing walk thru.  Purchaser shall indemnify and hold Seller harmless from and against any and all loss, cost, or expense, resulting from such access, except if such loss, cost, or expense was due to an act of Seller or Seller's Broker. Any such access shall be made at Purchaser's own risk (and/or the risk of such of Purchaser's representatives) and without liability to Seller for any personal or other injury suffered by Purchaser (or by Purchaser's representatives) while in or upon the Unit. Purchaser hereby indemnifies Seller against, and holds Seller harmless from, any claim, action, loss, liability or cost (including reasonable attorneys' fees) of any nature and in any manner arising out of or relating to Purchaser's (or Purchaser's representatives') access to the Unit.  The provisions of this paragraph shall survive Closing or the earlier termination of this Contract.

44. <u>Downpayment</u>.  In the event that a check is given as the Contract Deposit  is dishonored for any reason by the bank on which it is drawn, then Seller's Attorney shall notify Purchaser's Attorney, and Purchaser shall within two (2) business days thereafter, deliver to Seller's Attorney a bank check or wire transfer of immediately available funds in

Docusign Envelope ID: 91D57C44-23F1-467E-A6B7-F6D9F3DEAA96

substitution of the returned check. If Purchaser shall fail to delivery said substitute check or wire within the two (2) business day period, Seller may declare this Contract null and void and thereupon Seller shall be released from all obligations under this Contract.

45. <u>Lead Warning Statement and Disclosure</u>.   Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning.  Lead poisoning in young children may produce permanent neurological damage including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory.  Lead poisoning also poses a particular risk to pregnant women.  The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards.  A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.
    a.  Seller represents as follows:
        (i)    Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the Unit.
        (ii)   Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the Unit.
    b.  Purchaser represents as follows:
        (i)    Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home*.
        (ii)   Purchaser has waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

46. <u>Time of Essence</u>.  In the event that either party shall send a Time of the Essence ("TOE") letter, the parties agree that such TOE letter shall set for the date of Closing not less than thirty (30) days from the later of (a) the Scheduled Closing date set forth in Paragraph 1.15 of the Standard From; or, (b) the date that the Corporation approves Purchaser's application for approval. The date set forth in the TOE letter for Closing must provide the other party with at least ten (10) business days' notice of closing. For purposes of the TOE letter, the time periods stated therein are deemed "reasonable" by the parties.

47. <u>All Cash</u>. Purchaser represents that (i) Purchaser shall neither apply for nor accept a loan in connection with this purchase: (ii) this transaction shall be "ALL CASH"; (iii) Purchaser has or will have at closing have sufficient liquid assets to make all payments due from Purchaser under this Contract and to defray closing costs. Any attempt to secure financing, shall be deemed a default under this Contract.

FILED: KINGS COUNTY CLERK 04/25/2025 05:17 PM INDEX NO. 506732/2025
NYSCEF DOC. NO. 20 RECEIVED NYSCEF: 04/25/2025
Docusign Envelope ID: 91D57C44-23F1-467E-A6B7-F6D9F3DEAA96

IN WITNESS WHEREOF, the parties hereto have duly executed this Seller's Rider to Contract on the day and year first above written.

SELLERS:                                                    PURCHASER:

Brittany Parisi Doshi
_____
Brittany Parisi Doshi

_____
Catherine Kim Lee

Meet Bimal Doshi
_____
Meet Bimal Doshi

6

**Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards**

**Lead Warning Statement**

*Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.*

**Seller's Disclosure**
(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):
  (i) ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

  _____

  (ii) ☒ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.
(b) Records and reports available to the seller (check (i) or (ii) below):
  ☐ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

  _____

  ☒ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment** (initial)
(c) _____ Purchaser has received copies of all information listed above.
(d) _____ Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*
(e) Purchaser has (check (i) or (ii) below):
  (i) ☐ received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or
  (ii) ☒ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment** (initial)
(f) _____ Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**
The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| | | | |
|---|---|---|---|
| Brittany Parisi/Doshi | 10/18/2024 | Neeta | 10/18/2024 |
| Seller | Date | Seller | Date |
| | 10/17/2024 | | |
| Purchaser | Date | Purchaser | Date |
| Agent | Date | Agent | Date |

Case 2:25-cv-02113-EK-LGD   Document 1   Filed 04/16/25   Page 41 of 64 PageID #: 120
Docusign Envelope ID: 91D57C44-23F1-467E-A6B7-F6D9F3DEAA96

PURCHASER'S RIDER TO THAT CERTAIN CONTRACT OF
SALE DATED  BY AND BETWEEN
Catherine Kim Lee, AS PURCHASER and
Brittany Parisi Doshi and Meet Bimal Doshi, AS SELLER FOR
COOPEATIVE UNIT <u>4E</u>

<u>State Street, Brooklyn, NY 11201</u>

1.  **<u>PURCHASER'S RIDER TO CONTROL</u>**.  In the event of any inconsistency between the provisions of this Purchaser's Rider and those contained in the above-captioned Contract of Sale to which this Purchaser's Rider is annexed and Seller's Rider, if any, the provisions of this Purchaser's Rider shall govern and be binding.

2.  **<u>TERMINATION OF LIENS/DELIVERY OF STOCK and LEASE</u>**: Seller shall undertake to file (at Seller's sole cost and expense) any and all UCC-3 termination statements that are required to terminate any liens in connection with the Stock and Lease. Seller shall satisfy all consensual liens on the Shares and/or the Lease and those non-consensual liens on the Shares and/or the Lease that can be satisfied by the payment of an uncontested sum of money. Supplementing Paragraph 15.1 of the Contract, the delivery to Seller's Attorneys of a copy of a lien search report issued by a company regularly engaged in the business of issuing lien search reports shall be deemed to be the giving of a list of Liens to Seller. Seller represents that to Seller's knowledge, the Purchase Price is sufficient to make payment of all liens and encumbrances of record against the Unit and all standard closing costs that will be due from Seller. Seller shall promptly order the Stock and Lease from Seller's lender, if any, and shall arrange to surrender same at the closing. In the event Seller's Stock and/or Lease have been lost or misplaced, Seller shall pay all fees to the Corporation, its counsel or Managing Agent to have same replaced prior to or at closing and procure, at Seller's sole cost and expense, an Eagle 9 Co-op Insurance Policy insuring the Corporation, if required by the Corporation or Managing Agent..

3.  **<u>BANKRUPTCY / INSOLVENCY</u>**: Seller represents to Purchaser that they have not been the subject of any bankruptcy, insolvency or other similar proceeding during the period commencing five years prior to the Closing until and including the Closing. Seller hereby represents that this Contract is subject to, and conditioned upon there not being any adverse interest and/or pending and/or threatened claims, disputes, litigation or any judgments or liens in connection with the Unit, except for any liens with respect to any existing Seller financing which shall be paid off in full by Seller on or before closing.

Case 2:25-cv-02113-EMM-HMH Document-1 Filed 04/16/25047/1/25 42Pafe-57 Page 02 Page ID
Docusign Envelope ID: 91D57C44-23F1-467E-A6B7-F6D9F3DEAA96 #: 121

4. <u>**SELLER REPRESENATATIONS**</u>: Seller represents as of the date hereof the following:

    (a) There has been no water leakage or damage in or to the Unit during the twelve (12) month period immediately preceding the date of this Contract. In addition, the Seller has not been notified in writing during said twelve (12) month period of any water leaks elsewhere in the building which are purported to emanate from the Unit. If prior to closing there is a leak in the Unit, Seller shall promptly notify the Corporation or its Managing Agent of such leak and shall request prompt repair of the same. It shall be a condition to closing that there shall be no water leaks into, or emanating from the Unit.

    (b)

    (c) Seller has no actual knowledge that there is toxic mold that exists or has occurred in the Unit during Seller's ownership.

    (d) Seller represents that no "*bed-bugs*" (the term Bed-bugs shall also include other vermin and or insect infestations) have ever been found or treated within the Unit. In the event it is determined prior to the Closing hereunder, that bed-bugs are present within the Unit, then Seller hereby agrees to have such condition remediated and treated at Sellers sole cost and expense prior to the Closing.

    (e) Seller has no knowledge of nor has Seller received any written notice with respect to (1) any proposed amendment or modification to the Proprietary Lease, By-Laws or Rules and Regulations of the Cooperative Corporation; and (2) Seller is not aware of the existing or potential litigation against the Corporation.

    (f) Seller has not received any notice of default under the Lease, or a written notice from the Corporation that Seller is obligated to perform any repairs or maintenance in the Unit. Seller represents that as of the date hereof and on the actual closing date hereunder, it is not in violation and shall not be in violation of any House-Rules, By-Laws or the Proprietary Lease for the Cooperative Corporation.

    (g) All heating, plumbing systems, electrical (including outlets, thermostats and switches), mechanical and air conditioning systems and fixtures, appliances, doors,

INDEX NO. 506732/2025
Case 2:25-cv-03113-NRM Document 1 Filed 04/08/25 Page 43 of 56 PageID #: 122
Docusign Envelope ID: 9YD57C44-23F1-467E-A6B7-F6D9F3DEAA96
RECEIVED NYSCEF: 02/25/2025

windows and lighting fixtures, including fireplaces, if any, and other utilities installed or serving the Unit shall be in working order and condition at the time of Closing, subject to normal wear and tear, except to the extent the Corporation is responsible for same pursuant to the terms of the Lease. If there are any plumbing, heating, air conditioning or electrical problems to repair prior to closing which are the responsibility of the Corporation to repair, Seller, upon learning of same or receiving notice of such condition, shall promptly notify the Corporation of same and shall use Seller's reasonable efforts to have such problems corrected prior to closing and shall deliver all documentation, if any, regarding such repair to Purchaser at closing. The failure of the Corporation to repair these items shall not delay the Closing unless the Unit is unhabitable.

(h) Seller has not made any written complaint to the Corporation, Managing Agent or any other shareholder of the Corporation regarding noise, offensive odors, offensive conduct, lack of heat or hot water or water pressure, banging pipes, mold, asbestos, vermin or any other disturbance or adverse condition affecting the Unit in the last twelve (12) months.

(i) Any and all alterations or additions in or to the Unit made by the Seller, including the legal combination of the Unit, if any, were made in full compliance with applicable laws, rules, regulations and ordinances of all governmental and municipal authorities having jurisdiction, and in full compliance with the terms, covenants and conditions of the Lease, and the Corporation's by-laws, rules and regulations. It shall be a condition of Purchaser's obligations to close under this Contract that any open permits filed with the New York City Department of Buildings shall be signed off, in compliance with all applicable codes, rules, regulations, ordinances, statutes or other laws and a Letter of Completion issued only against the Unit.

(j)

(k) Intentionally omitted.

(l) Seller represents that no insurance claims have been made by Seller in connection with or relating to the Unit within the past two (2) years.

Docusign Envelope ID: 91D57C44-23F1-467E-A6B7-F6D9F3DEAA96

Case 1:25-cv-03131-EMD  Document Filed 04/16/2025  Page 44 of 52 Page ID #: 123

(m) Except for the amounts set forth in ¶1.17 ("Maintenance") and ¶1.18 ("Assessment"), there are no other monthly or periodic payments required to be made to the Corporation in connection with the Unit, the Shares, and/or the Lease.

5.   Seller shall arrange for the termination of all utilities which Seller receives directly from the public utility or cable company prior to the date of vacating the Unit and shall pay any and all outstanding amounts when due; however, the gas and/or electrical systems shall be operational on the date of the closing. This representation shall survive the Closing.

6.   Seller shall not make any alterations to the Unit between the date hereof and the date of closing, except to (a) keep the Unit in good repair, and (b) make all repairs Seller is obligated to perform under this Contract and pursuant to the Lease and other requirements of the Corporation and/or Managing Agent.

7.   At the time of Closing, required smoke detector(s) and carbon monoxide detector(s) shall be installed and operable.

8.   Seller agrees to indemnify, and hold Purchasers harmless from and against all liability, damage, loss or expense (including reasonable attorney's fees and disbursements) arising out of any claim for the payment of any real estate transfer tax including NYS and NYC transfer taxes and any IT 2664 payment(s) which Seller owes and/or FIRPTA payments, if any. Notwithstanding anything to the contrary herein, the provisions hereof shall survive the Closing.  Purchaser shall pay the Mansion Tax.

9.   **REPAIRS**. In the event that the removal by Seller of anything which had been affixed or hung on the walls of the unit results in a hole remaining which is larger than a US Dime, Seller shall, prior to closing and at Sellers expense, repair the hole in question and refinish the affected area so as to create a uniform surface and appearance with the balance of the wall in question  Seller is not required to paint.

10.  **REVERSAL OF COOPERATIVE TAX ABATEMENT:** Seller represents that Seller is a New York State resident and the Unit is not the Seller's primary residence. Should Purchaser be sent a bill for an Assessment covering the period of Seller's ownership, Seller shall reimburse Purchaser for this expense. The representations in this paragraph shall survive closing for a period of one (1) year.  In the event a previously granted and received tax abatement issued to Seller is revoked or reversed (due to reasons, including but not limited to, Seller being an entity or trust or the Unit not being Seller's primary residence), any and all charges to

Purchaser relating to this Unit only in connection therewith shall
be promptly paid by Seller. This provision and Seller's
obligations hereunder shall survive the closing for one (1) year.

11. __JUDGEMENTS/LIENS__.N/A all cash.


12. __Building Notices__. Any material notice that Seller receives between
the date of this Contract and the actual Closing date shall, as a
courtesy, be promptly forwarded to both purchaser and purchaser's
attorney herein. Failure to deliver shall not be a default.

     **IN WITNESS WHEREOF, THE PARTIES HERETO HAVE DULY EXECUTED
THIS PURCHASER'S RIDER AS OF THE DATE FIRST ABOVE WRITTEN.**

_Brittany Parisi Doshi_
Seller: Brittany Parisi Doshi

_Meet_
Seller: Meet Bimal Doshi

Purchaser: Catherine Kim Lee

Purchaser:

Case 25-01313-ESL6 Document 1 Filed 04/16/25 Page 46 of 65 Page of 2 56 ID #: 125

# EXHIBIT B

Case 2:25-cv-02131-EMC Document 1 Filed 04/16/25 Page 47 of 64 Page ID #: 126

From: Leah Herman <leahrherman@gmail.com>
Date: On Wednesday, January 8th, 2025 at 9:59 AM
Subject: VOTE TODAY: 4E Buyer Candidate Cathy Lee
To: Kate Teale <kteale@nyc.rr.com>, David Henderson <yourworldisyou@gmail.com>, Daniel Tovrov <daniel.tovrov@gmail.com>, Diane Lloyd <dianeelloyd@hotmail.com>, Missy Green <missygreen23@hotmail.com>, Peter Wagener <peter@wagener.org>, David Henderson <dave@davidhenderson.org>, Meet Doshi <mail@meetdoshi.com>, Mary Warner <marywarner718@gmail.com>, Sara Chen <sarachen168@gmail.com>, Harley Ware <harleytware@gmail.com>, Bia Carminati <bia.carminati@gmail.com>, Stacey Tovrov <stacey.tovrov@gmail.com>, Molly Lovell <molly.lovell@gmail.com>
CC: Matt Lischin <matt.lischin@gmail.com>

Thanks Kate. I think this summarizes many of the factors that are on all our minds after yesterday's meeting.

I'm hoping other co-op members will weigh in here if there are any other relevant thoughts they want the group to consider, as they've slept on it.

I'd like to offer up one additional item for a potential vote today - if the majority votes no and this seller is denied, I'd be in favor of allowing Meet & Brittany to extend their sublease with Mike and Ali for an additional period of up to six months. This is a special case and given that this would be an unprecedented buyer denial, we know and trust Mike and Ali, it would help Meet and Brittany financially with the cost of carrying the apartment once again until another buyer is secured, I'd like to suggest we vote on this at the same time as the current buyer for 4E.

Please see this document to input your vote by end of day. I've included this second topic for a vote as well, but if other shareholders don't agree that it makes sense to include a vote on the sublease at the same time, please chime in and I'll remove the second item from the spreadsheet.

Thank you,
Leah

Case 2:25-cv-02813-EK-LKE Document 1 Filed 04/10/25 Page 48 of 56 PageID #: 127

On Tue, Jan 7, 2025 at 8:32 PM Kate Teale <kteale@nyc.rr.com> wrote:

OY - that was painful.

Obviously everyone will make up their own minds and vote accordingly. But here's my two cents.

First, I was totally expecting this to be an easy yes. Jalen was great. But any one of the following issues would be enough of a disqualifier.

1. A large, anxious dog who by applicant's own admission "barks a lot"

2. Buyer likely to be absent a lot

3. Buyer asks at this late stage, to change the terms of purchase so that Jalen is a co-owner

4. Buyer has bad knees and asked about installing a chair lift. This would be a major expense, would take up a lot of space and be of no interest or use to the majority of shareholders.

5. They asked about how thin the walls are and said they like to play loud music

Cathy repeated that her father's illness was 'un-forseen' - but he's 90. Even a self reliant, fit 90yr old is highly likely to have forseeable health issues. She states repeatedly that she is the primary care-giver without mentioning any plan for her role to be covered when she leaves.

I wish this had gone better…


Kate

99 State St #5E
Brooklyn NY 11201
tel: (917) 847 8613
kteale@nyc.rr.com

2

Case 2:25-cv-01131-EMLDGE Document 1 Filed 04/16/25 Page 49 Pages 57 of 64 Page ID #: 128

# EXHIBIT C

**WEXLER & KAUFMAN PLLC**

January 24, 2025

*By E-mail and Overnight Delivery*
Seth Ben-Ezra, Esq.
Seth I. Ben-Ezra, P.C.
425 Broadhollow Road, Suite 220
Melville, NY 11747
seth@benezralaw.com

**Re:    Sale of 99 State Street, Unit 4E, Brooklyn, NY 11201 ("Premises") pursuant to the Contract of Sale, dated October 18, 2024 ("Contract") by and between Brittany Parisi Doshi and Meet Bimal Doshi (collectively referred to as "Seller") and Catherine Kim Lee (referred to as "Purchaser").**

Dear Mr. Ben-Ezra:

Please take notice that the Purchaser is in default of the above-referenced Contract. Purchaser misrepresented material facts in the Contract, the Board Application as well as made gross misrepresentations at the Board interview. This is a material default by the Purchaser and grounds for Seller to cancel this Contract and retain the Contract Deposit as liquidated damages under Paragraph 13.1 of the Contract.

The Purchaser is in default of the Contract under the following provisions:

        1.23; 1.23.2; 4.2.1; 4.2.5; 4.3; 6.2.1; 6.4 and Seller's Rider 35(E)

It is clear that Purchaser made representations to the Corporation contrary to what was represented in the Contract by (1) failing to disclose that she has a dog, which specifically by Purchaser's own admission is "a large, anxious dog who barks a lot"; (2) indicating that her adult daughter would be residing in the property with her when the daughter was not disclosed in the Contract as a Proposed Occupant and (3) requesting at the Board interview to revise the terms of the Contract so that her daughter is a co-owner.

Further, Purchaser did not act in good faith under Section 6.2 of the Contract by (1) asking the Board about how thin the walls are and saying her and her daughter like to play loud music, (2) describing her large, anxious dog, that was not disclosed in the Contract, as one that "barks a lot," (3) without any medical proof, asking the Board about installing a chair lift for her knees; and (4) admitting that the Premises will not be her primary residence.

Purchaser was called in by the Board for a second interview to clarify some concerns. This is when, unprompted, she mentioned the barking dog and similarly began asking about thin walls and loud music. It is obvious she actively looked for ways to create discord in her interview.

FILED: KINGS COUNTY CLERK 04/25/2025 05:17 PM                    INDEX NO. 506732/2025
NYSCEF DOC. NO. 40                                              RECEIVED NYSCEF: 04/25/2025

In light of the foregoing, NOTICE IS HEREBY GIVEN THAT PURCHASER IS IN DEFAULT UNDER THE CONTRACT and Seller is entitled to the defaults, remedies, and indemnities under Section 13 of the Contract, which states:

13 Defaults, Remedies and Indemnities
13.1 In the event of a default or misrepresentation by Purchaser, Seller's sole and exclusive remedies shall be to cancel this Contract, retain the Contract Deposit as liquidated damages and, if applicable, Seller may enforce the indemnity in Section 13.3 as to brokerage commission or sue under Section 13.4. Purchaser prefers to limit Purchaser's exposure for actual damages to the amount of the Contract Deposit, which Purchaser agrees constitutes a fair and reasonable amount of compensation for Seller's damages under the circumstances and is not a penalty. The principles of real property law shall apply to this liquidated damages provision.

Please be advised that Seller shall retain the Contract Deposit, the Contract is deemed null and void, and reserve its rights under the Contract and applicable law.

Please be guided accordingly.

Very truly yours,

Jacqueline Newmark, Esq.

cc: Brittany Parisi Doshi and Meet Bimal Doshi

Case 2:25-cv-01313-EMB Document 1 Filed 04/16/25 Page 52 of 56 PageID
#: 131

# EXHIBIT D

Case 25-02313-MJ Doc 1 Filed 04/16/25 Page 53 of 66 Page ID #: 132



**KISHNER | MILLER | HIMES P.C.**

**40 Fulton Street, 12th Floor**
**New York, New York 10038**
**Tel.: (212) 585-3425**
**Fax: (888) 332-5658**
www.kishnerlegal.com

February 12, 2025

**VIA EMAIL**                                           **VIA EMAIL**
**VIA OVERNIGHT COURIER**                   **VIA OVERNIGHT COURIER**
Allon Lifshitz, Esq.                                     Jacqueline Newmark, Esq.
Cohen & Gresser LLP                                  Wexler & Kaufman PLLC
800 Third Avenue                                        462 Seventh Avenue, 12th Floor
New York, New York 10022                        New York, New York 10018
alifshitz@cohengresser.com                        jnewmark@wlklegal.com

> **Re:** **Termination of Contract of Sale dated October 18, 2024 ("Contract of Sale")
> between Brittany Parisi Doshi & Meet Bimal Doshi, collectively referred to as
> seller ("Seller"), and Catherine Kim Lee ("Lee"), as purchaser ("Purchaser"),
> for the premises known as Coop Unit 4E ("Unit") located at 99 State Street,
> Brooklyn, New York 11201 ("Building")**

**NOTICE OF OBJECTION**

Attorney Lifshitz and Attorney Newmark:

This office represents the Seller in connection with the above-referenced transaction. We
write in response to Attorney Lifshitz's letter dated February 3, 2025 ("February 3rd Letter"),
wherein you demand a return of the Contract Deposit to Purchaser. However, your February 3rd
Letter fails to address Purchaser's bad faith conduct as outlined in the letter dated January 24, 2025
("January 24th Letter") from the Seller's transactional counsel, Jacqueline Newmark, Esq., who is
also the Escrowee under the Contract of Sale. As detailed in the January 24th Letter the Purchaser
is in default of the Contract of Sale under the following provisions: 1.23, 1.23.2, 4.2.1, 4.2.5, 4.3,
6.2.1, 6.4 and Seller's Rider 35(E).

Indeed, your February 3rd Letter does not deny or dispute Purchaser's misrepresentations
of material facts in the Contract, the Board Application and during the Board interview as set forth
in the January 24th Letter. It is incontrovertible that Purchaser made representations to the
Corporation that were contrary to what Purchaser represented in the Contract of Sale in violation
of Section 4.2.5. Specifically, contrary to the representations Purchaser made in Sections 1.23,
1.23.2 and 4.2.1 of the Contract of Sale, Purchaser represented to the Corporation that she had a
dog, that she intended for her adult daughter to reside in the Unit with her and also requested to
revise the terms of the Contract of Sale so that her daughter is a co-owner.

Case 2:25-cv-03131-EMBed DocumentDocument Filed 04/16/25 04/17/25 54Page 62 of 64PageID
#: 133

February 12, 2025
Page - 2 -

It is also irrefutable that Purchaser did not act in good faith under Section 6.2 of the Contract by, among other things, (1) telling the Board that she and her daughter like to play loud music, (2) describing her "large, anxious dog who barks a lot" which was not disclosed in the Contract of Sale, and (3) admitting that she is the primary caregiver for her parents who live in California which is antithetical to Purchaser's representation in Section 35(e) of the Seller's Rider to the Contract of Sale that the Unit would be her primary residence.

Your letter's silence on these facts is telling.

It is indisputable that Purchaser's bad faith conduct directly led to, and caused the Corporation to reject her application. As such, under Section 6.4 of the Contract of Sale, Purchaser is in default and Section 13.1 governs entitling a turnover of the full Contract Deposit to the Seller. Accordingly, **Seller hereby rejects your demand that the Contract Deposit be released to Purchaser**. The Escrowee is on notice that she is not authorized to release the Contract Deposit to Purchaser as same is hereby **OBJECTED** to by way of this Notice of Objection.

Further, demand is hereby made that Purchaser's February 3rd Letter be withdrawn and permit the Contract Deposit be released to Seller based on Purchaser's unequivocal bad faith conduct as set forth herein and the January 24th Letter. Should Purchaser fail to permit the Contract Deposit to be released to Seller and this matter proceeds to litigation, Seller will pursue Purchaser for all of their costs and fees, including attorneys' fees, in accordance with Paragraph 40 of the Seller's Rider to the Contract of Sale, as a result of Purchaser's breach of the Contract of Sale.

Nothing contained herein shall be deemed a waiver of any of Seller's rights or remedies in law, the Contract of Sale or equity.

I remain,

Very truly yours,

Ryan O. Miller

Case 2:25-cv-03131-EMB DocumentDocument Filed 04/16/2025 04/17/25 55 Page 63 of 64 PageID #: 134

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

------------------------------------------------------------------------x
                                  :
MEET BIMAL DOSHI and BRITTANY PARISI    :     Index No. 506732/2025
DOSHI,                                    :
                                    :
                  Plaintiffs,     :     **STIPULATION**
                                    :
        – against –                  :
                                    :
CATHERINE KIM LEE,                  :
                                    :
                  Defendant.     :
                                    :
                                    :
------------------------------------------------------------------------x

       **WHEREAS**, Plaintiffs filed a Summons and Complaint in this action on February 26, 2025 (NYSCEF Doc. No. 1);

       **NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED** by the parties, through their undersigned counsel, as follows:

       1.      Defendant shall answer, move against, or otherwise respond to the Complaint in this action on or before April 28, 2025.

       2.      Defendant agrees to accept service of the Complaint filed in this action through her undersigned attorneys.

       3.      Defendant waives any and all objections to personal jurisdiction.

       4.      Defendant agrees that this court is a proper venue for this action.

       5.      This stipulation does not constitute a waiver by Defendant of any other substantive or procedural defenses beyond what is stated herein.

6.     This stipulation may be executed in counterparts, and all such counterparts shall be considered as one stipulation.  An electronic signature on this stipulation or a signature sent by facsimile shall be deemed and considered as an original.


Dated:  March 17, 2025
        New York, New York

**COHEN & GRESSER LLP**

By: */s/ Allon Lifshitz*
    Allon Lifshitz
    Randall W. Bryer
    800 Third Avenue, 21st Floor
    New York, NY 10022
    Phone: (212) 957-7600
    Alifshitz@cohengresser.com

*Attorneys for Defendant Catherine Kim Lee*

**KISHNER MILLER HIMES, P.C.**

By: */s/ Ryan O. Miller*
    Ryan O. Miller
    Eric B. LaMons
    40 Fulton Street, 12th Floor
    New York, NY 10038
    Phone: (212) 585-3425
    rmiller@kishnerlegal.com

*Attorneys for Plaintiffs Meet Bimal Doshi
and Brittany Parisi Doshi*

2